Ishmael JAFFREE; Jamael Aakki Jaffree, Makeba Green, and Chioke Saleem Jaffree, infants, by and through their best of friend and father, Ishmael Jaffree, Plaintiffs,

v.

The BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY; Dan C. Alexander, Dr. Norman Berger, Hiram Bosarge, Norman G. Cox, Ruth F. Drago, and Dr. Robert Gilliard, in their official capacities as members of the Board of School Commissioners of Mobile County; Dr. Abe L. Hammons, in his official capacity as Superintendent of the Board of Education of Mobile County; Annie Bell Phillips, individually and in her official capacity as principal of Morningside Elementary School; Julia Green, individually and in her official capacity as a teacher at Morningside Elementary School; Betty Lee, individually and in her official capacity as principal of E.R. Dickson Elementary School; Charlene Boyd, individually and in her official capacity as a teacher at E.R. Dickson Elementary School; Emma Reed, individually and in her official capacity as principal of Craighead Elementary School; Pixie Alexander, individually and in her official capacity as a teacher at Craighead Elementary School, Defendants.

Civ. A. No. 82–0554–H.

United States District Court, S.D. Alabama, S.D.

Jan. 14, 1983.

---

**2.** This doubt is not overcome by the letter plaintiff typed requesting review of the ALJ's decision. Tr. 10.

Ronnie L. Williams, Mobile, Ala., for plaintiffs.

Robert H. Mudd, Jr., Robert C. Campbell, III, Mobile, Ala., for defendants Board of School Commissioners.

Fob James, III, pro se.

Charles S. Coody, Counsel Director, Div. of Legal Services, Dept. of Education, Montgomery, Ala., for defendants Tyson, Creel, Cherry, Higginbotham, Poole, Martin, Allen and Roberts, Bob Sherling, Mobile, Ala., for intervening defendants.

## MEMORANDUM OPINION

HAND, Chief Judge.

*Prelusion*

If in the opinion of the People, the distribution or modification of the Constitutional powers be in any particular wrong, let it be corrected by an amendment in the way in which the Constitution designates. But let there be no change by usurpation; for though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed. The precedent must always greatly overbalance in permanent evil any partial or transient benefit which the use can at any time yield.

> Farewell Address by
> George Washington

*reprinted in* R. Berger,
*Government by Judiciary* 299 (1977).

Ishmael Jaffree, on behalf of his three (3) minor children, seeks declaratory and injunctive relief. In the original complaint Mr. Jaffree sought a declaration from the Court that certain prayer activities initiated by his children's public school teachers violated the establishment clause of the first amendment to the United States Constitution. He sought to have these prayer activities enjoined.

A trial was held on the merits on November 15–18, 1982. After hearing the testimony of witnesses, considering the exhibits, discovery, stipulations, pleadings, briefs, and legal arguments of the parties, the Court enters the following findings of fact and conclusions of law.

## I. *Findings of Fact*

Ishmael Jaffree is a citizen of the United States, a resident of Mobile County, Alabama, and has three (3) minor children attending public schools in Mobile County, Alabama: Jamael Aakki Jaffree, Makeba Green and Chioke Saleem Jaffree.

Defendants, Annie Bell Phillips (principal) and Julia Green (teacher) are employed at Morningside Elementary School, where Jamael Aakki Jaffree attended school during the 1981–82 school year. Defendants Betty Lee (principal) and Charlene Boyd (teacher) are employed at E.R. Dickson Elementary School where Chioke Saleem Jaffree attended during the 1981–82 school year. Defendants, Emma Reed (principal) and Pixie Alexander (teacher) are employed at Craighead Elementary School where Makeba Green attended school during the 1981–82 school year. Each of these defendants is sued individually and in their official capacity. Each of the schools is part of the system of public education in Mobile County, Alabama.

Dan Alexander, Dr. Norman Berger, Hiram Bosarge, Norman Cox, Ruth F. Drago and Dr. Robert Gilliard are members of the Board of School Commissioners of Mobile County, Alabama. As commissioners, each

of these defendants collectively is charged by the laws of the State of Alabama with administering the system of public instruction for Mobile County, Alabama. These defendants are sued only in their official capacity.

Dr. Abe L. Hammons is the Superintendent of Education for Mobile County, Alabama. Defendant Hammons has direct supervisory responsibilities over all principals, teachers and other employees of the Mobile County Public School System. This defendant is sued only in his official capacity.

Defendant Boyd, as early as September 16, 1981, led her class at E.R. Dickson in singing the following phrase:

God is great, God is good,
Let us thank him for our food,
bow our heads we all are fed,
Give us Lord our daily bread.
Amen!

The recitation of this phrase continued on a daily basis throughout the 1981–82 school year.

Defendant Boyd was made aware on September 16, 1981 that the minor plaintiff, Chioke Jaffree, did not want to participate in the singing of the phrase referenced above or be exposed to any other type of religious observances. On March 5, 1982, during a parent-teacher conference, Ms. Boyd was told by Chioke's father that he did not want his son exposed to religious activity in his classroom and that, in Mr. Jaffree's opinion, the activity was unlawful. Again, on March 11, 1982, Ms. Boyd received a handwritten letter from Mr. Jaffree which again advised her that leading her class in chanting the referenced phrase was unlawful. This letter further advised Ms. Boyd that if the practice was not discontinued that he would take further administrative and judicial steps to see that it was. Finally, Ms. Boyd was made aware of the contents of a letter drafted by Mr. Jaffree, dated May 10, 1982, which had been sent to Superintendent Hammons complaining about the prayer activity in Ms. Boyd's classroom. Notwithstanding Mr. Jaffree's protestations, the recitation of the prayer continued.

Defendant Lee learned on March 8, 1982, that Mr. Jaffree had complained about the prayer activities which were being conducted in defendant Boyd's classroom. Ms. Lee directly spoke with Mr. Jaffree on March 11, 1982, and learned from him that he was opposed to the prayer activities in Ms. Boyd's class and that he felt the same to be unconstitutional. On the same day, Ms. Lee called Mr. Larry Newton, Deputy Superintendent, who informed her that the prayer activity in Ms. Boyd's class could continue on a "strictly voluntary basis."

Defendant Pixie Alexander has led her class at Craighead in reciting the following phrase:

God is great, God is good,
Let us thank Him for our food.

Further, defendant Pixie Alexander had her class recite the following, which is known as the Lord's Prayer:

Our Father, which art in heaven, hallowed be Thy name. Thy kingdom come. Thy will be done on earth as it is in heaven. Give us this day our daily bread and forgive us our debts. as we forgive our debtors. And lead us not into temptation but deliver us from evil for thine is the kingdom and the power and the glory forever. Amen.

The recitation of these phrases continued on a daily basis throughout the 1981–82 school year.

Defendant Pixie Alexander learned on May 24, 1982, that Mr. Jaffree had complained, through a letter dated May 10, 1982, to defendant Hammons, about her leading her class in the above-referenced prayer activity. After Ms. Alexander learned of Mr. Jaffree's May 10, 1982 letter, she continued to lead her class in reciting the referenced phrases.

Ms. Green admitted that she frequently leads her class in singing the following song:

For health and strength and daily food,
we praise Thy name, Oh Lord.

This activity continued throughout the school year, despite the fact that Ms. Green had knowledge that plaintiff did not want

his child exposed to the above-mentioned song. *See* defendant Green's response to plaintiffs' Interrogatories Nos. 21, 22, 50 and 51.

Upon learning of the plaintiffs' concern over prayer activity in their schools, defendants Reed and Phillips consulted with teachers involved, however, neither defendant advised or instructed the defendant teachers to discontinue the complained of activity.

Prior to the 1981–82 school year, defendants Reed, Phillips, Boyd, and to a lesser extent, Green, each knew the Board of School Commissioners of Mobile County had a policy regarding religious activity in public schools. However, not one of the teachers sought or received advice from the board or the superintendent prior to the plaintiffs' initial complaint regarding whether their classroom prayer activities were consistent with the policy.

The policy on religious instruction adopted by the Board of School Commissioners of Mobile County reads as follows:

RELIGIOUS INSTRUCTION

Schools shall comply with all existing state and federal laws as these laws pertain to religious practices and the teaching of religion. This policy shall not be interpreted to prohibit teaching about the various religions of the world, the influence of the Judeo-Christian faith on our society, and the values and ideals of the American way of life.

School attendance is compulsory in the State of Alabama. Alabama Code § 16–28–3 (1975).

1. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. Initially, it should be noted that neither 28 U.S.C. §§ 2201 nor 2202 afford any subject-matter jurisdiction to a federal court as the

The complaint in this case was later amended to include allegations against Governor Fob James and various state officials. The claims against the state officials were severed, Fed.R.Civ.P. 21, and they are the subject of a separate order which the Court entered today.

This recitation of the findings of fact is not intended to be an all-inclusive statement of the facts as they were produced in this case. Because of the following opinion the Court is of the impression that the facts above-recited constitute a sufficient recitation for deciding this case. However, in the event there is a disagreement with the conclusions reached by this Court, the Court does not desire to be precluded from a further recitation of appropriate fact as may be essential to further conclusions in the case. Examples of what the Court alludes to is the factual bases for consideration of the questions of freedom of speech, whether or not secular humanism is in fact a religion, and the propriety of the free exercise of religion.

II. *Conclusions of Law*

A. *Subject-Matter Jurisdiction*

▆▆▆▆ This action is brought under 42 U.S.C. § 1983.[1] The complaint alleges that the subject-matter jurisdiction of the Court "is evoked pursuant to Title 28, Sections 1343(3) and (4), and Sections 2201 and 2202 of the United States Code." *See* Complaint at 2 (filed May 28, 1982). Neither of the two amended complaints add anything to this jurisdictional allegation.[2]

complaint alleges. These sections provide only a remedy.

The operation of the Declaratory Judgment Act is procedural only. By passage of the Act, Congress enlarged the range of remedies available in the federal courts but it did not extent their subject-matter jurisdiction. Thus there must be an independent basis of jurisdiction, under statutes equally applicable to actions for coercive relief, before a federal court may entertain a declaratory judgment action.

10 C. Wright and A. Miller, *Federal Practice and Procedure* § 2766, 841 (1973) (footnotes omitted).

The complaint alleges that rights guaranteed to the plaintiffs under the first and fourteenth amendments have been violated.[3] The subject-matter jurisdiction of a federal court over a claim arising under 42 U.S.C. § 1983 rests upon 28 U.S.C. § 1343(3). While the complaint does not allege that subject-matter jurisdiction is vested in the court under the general, federal-question jurisdictional statute, 28 U.S.C. § 1331, certainly subject-matter jurisdiction is vested under that provision since a federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, exclusive of the amount-in-controversy. Thus, the Court concludes that it has subject-matter jurisdiction over the claims alleged by the plaintiffs.[4]

### B. School-Prayer Precedent

The United States Supreme Court has previously addressed itself in many cases to the practice of prayer and religious services in the public schools. As courts are wont to say, this court does not write upon a clean slate when it addresses the issue of school prayer.

Viewed historically, three decisions have lately provided general rules for school prayer. In *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), *Abington v.*

*Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), and *Murray v. Curlett,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the Supreme Court established the basic considerations. As stated, the rule is that "[t]he First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach." *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947) (per Black, J.).

In *Engel v. Vitale* parents of public school students filed suit to compel the board of education to discontinue the use of an official prayer in the public schools. The prayer was asserted to be contrary to the beliefs, religions, or religious practices of the complaining parents and their children. In *Engel* the board of education, acting in its official capacity under state law, directed the principals to cause the following prayer to be said aloud by each class at the beginning of the day in each homeroom: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country." 370 U.S. at 422, 82 S.Ct. at 1262. This prayer was adopted by the school board because it believed the prayer would help instill the proper moral and spiritual training needed by the students.

Likewise, 28 U.S.C. § 1343(4) does not afford subject-matter jurisdiction to a federal court over claims brought under 42 U.S.C. § 1983. Section 1343(4) affords subject-matter jurisdiction to the federal court only over those claims which are brought under "any Act of Congress providing for the protection of civil rights ...." "Standing alone, § 1983 clearly provides no protection for civil rights since ... § 1983 does not provide any substantive rights at all." *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 618, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979).

3. In fact, the complaint alleges that "[t]his cause of action arises under the First and Fourteenth Amendments to the United States Constitution ...." *See* Complaint at 2. This Court has previously explained that no implied cause of action exists under either the first or fourteenth amendments, at least when the first amendment is applied to persons acting under color of state law. The very purpose for enacting 42 U.S.C. § 1983 was to provide a remedy

to vindicate the rights afforded by the federal Bill of Rights when persons acting under color of state law violated those rights. It would be incongruous to imply a remedy where Congress has expressly afforded a remedy. *See Strong v. Demopolis City Board of Education,* 515 F.Supp. 730, 732 n. 1 (S.D.Ala.1981) (per Hand, J.).

4. "[T]he existence of a claim for relief under § 1983 is 'jurisdictional' for purposes for invoking 28 U.S.C. § 1343, even though the existence of a meritorious constitutional claim is not similarily required in order to invoke jurisdiction under 28 U.S.C. § 1331. *See Bell v. Hood,* 327 U.S. 678, 682 [66 S.Ct. 773, 776, 90 L.Ed. 939] (1946); *Mt. Healthy [City School District v. Doyle],* 429 U.S. 274, 278–79 [97 S.Ct. 568, 571–72 (1977).]" *Monell v. Department of School Services,* 436 U.S. 658, 716, 98 S.Ct. 2018, 2048, 56 L.Ed.2d 611 (1978).

The parents argued that the school board violated the establishment clause of the first amendment when it directed that this prayer be recited in the public schools. The first amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The Supreme Court found "that by using its public school system to encourage recitation of the Regent's prayer, the State of New York ha[d] adopted a practice wholly inconsistent with the Establishment Clause." *Id.* at 422, 82 S.Ct. at 1262. The Court found this prayer to be a religious activity. The prayer constituted "a solemn avowal of divine faith and supplication for the blessing of the Almighty. The nature of such prayer has always been religious . . . ." *Id.* at 424–25, 82 S.Ct. at 1264–65. The Court noted that "[i]t [wa]s a matter of history that this very practice of establishing governmentally composed prayers for religious services was one of the reasons which caused many of our early colonists to leave England and seek religious freedom in America." *Id.* at 425, 82 S.Ct. at 1264. Therefore, according to the Court, the prayer "breache[d] the constitutional wall of separation between Church and State." *Id.*

Citing historical documents, the Court observed that

[b]y the time of the adoption of the Constitution, our history shows that there was a widespread awareness among many Americans of the danger of a union of Church and State. These people knew, some of them from bitter personal experience, that one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services . . . . The First Amendment was added to the Constitution to stand as a guarantee that neither the power nor the prestige of the Federal Government would be used to control, support, or influence the kinds of prayer the American people can say— that the people's religions must not be

subjected to the pressures of government or change each time a new political administration is elected to office. Under the Amendment's prohibition against governmental establishment of religion, *as reinforced by the prohibitions of the Fourteenth Amendment, government in this country, be it state or federal,* is without power to prescribe by law any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity.

*Id.* at 429–30, 82 S.Ct. at 1266 (emphasis added).

The assertion by the Court that the establishment clause of the first amendment applied to the states was unaccompanied by any citation to authority. This conclusion was reached supposedly upon its examination of historical documents.

In dissent, Mr. Justice Stewart argued that the majority in *Engel* misinterpreted the first amendment. As Mr. Justice Stewart saw it, an official religion was not established by letting those who wanted to say a prayer say it. To the contrary, Mr. Justice Stewart thought "that to deny the wish of those school children to join in reciting this prayer is to deny them the opportunity of sharing in the spiritual heritage of our Nation." *Id.* at 445, 82 S.Ct. at 1274–75. As Mr. Justice Stewart saw the problem, our country is steeped in a history of religious tradition. That religious tradition is reflected in countless practices common in our institutions and governmental officials. For instance, the United States Supreme Court has always opened each day's session with the prayer "God save the United States and this Honorable Court." *Id.* at 446, 82 S.Ct. at 1275. Each President of the United States has, upon assuming office, sworn an oath to God to properly execute his presidential duties. Our national anthem, "The Star-Spangled Banner," contains these verses:

Blest with the victory and peace, may the heav'n rescued land
Praise the Pow'r that hath made
and preserved us a nation!

Then conquor we must, when our
cause it is just,
And this be our motto "In God is
our Trust."

*Id.* at 449, 82 S.Ct. at 1277. The Pledge of Allegiance to the Flag contains the words "one Nation *under God,* indivisible, with liberty and justice for all." *Id.* (emphasis in original). Congress added this in 1954. Mr. Justice Stewart believed that the Regent's prayer in New York had done no more than "to recognize and to follow the deeply enriched and highly cherished spiritual traditions of our Nation—traditions which came down to us from those who almost two hundred years ago avowed their 'firm Reliance on the Protection of divine Providence' when they proclaimed the freedom and independence of this brave new world." *Id.* at 450, 82 S.Ct. at 1277.

Following the decision by the Supreme Court in *Engel,* the Court decided *Abington v. Schempp* and *Murray v. Curlett.* In *Abington,* a state law in Pennsylvania required that

> [a]t least ten verses from the Holy Bible shall be read, without comment, at the opening of each public school on each school day. Any child shall be excused from such Bible reading, or attending such Bible reading, upon the written request of his parent or guardian.

374 U.S. 205, 83 S.Ct. 1562. The Schempp family, husband and wife and two of their three children, brought suit to enjoin enforcement of this statute. The Schempps contended that their rights under the fourteenth amendment of the United States Constitution were being violated.

Each morning at the Abington Senior High School between 8:15 a.m. and 8:30 a.m., while students were attending their homerooms, selected students would read ten verses from the Holy Bible. These Bible readings were broadcast to each room in the school building. Following the Bible readings the Lord's Prayer was recited. As with the Bible readings, the Lord's Prayer was broadcast throughout the building. Following the Bible readings and the Lord's Prayer, a flag salute was performed. Participation in the opening exercises, as directed by the Pennsylvania statute, was voluntary.

No prefatory statement, no questions, no comments, and no explanations were made at or during the exercises. Students and parents were advised that any student could absent himself from the classroom or, should he elect to remain, not participate in the exercises.

In *Murray v. Curlett,* the Board of School Commissioners of Baltimore City adopted a rule which "provided for the holding of opening exercises in the schools of the city, consisting primarily of 'reading, without comment, of a chapter in the Holy Bible and/or the use of the Lord's Prayer.'" 374 U.S. at 211, 83 S.Ct. at 1565. An athiest, Mrs. Madalyn Murray, objected to the Bible reading and the recitation of the Lord's Prayer. After receiving the objection the board specifically provided that the Bible reading and the use of the Lord's Prayer should be conducted without comment and that any child could be excused from participating in the opening exercises or from attending them upon the written request of his parent or guardian.

Because of the similarity of the issues in both the *Abington* case and the *Murray* case the Supreme Court consolidated both cases on appeal and decided them together. The Court recognized that "[i]t is true that religion has been closely identified with our history and government.... 'The history of man is inseparable from the history of religion. And ... since the beginning of that history many people have devoutly believed that "More things are wrought by prayer than this world dreams of."'" *Abington School District v. Schempp,* 374 U.S. at 212–13, 83 S.Ct. at 1566 (quoting *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952)). Notwithstanding this recognition by the Court that the early history of this country, together with the history of man, was inseparable from religion the Court found the Bible reading and the recitation of the Lord's Prayer to be an unconstitutional abridgement of the first amendment prohibition that "Congress shall

make no law respecting an establishment of religion, or prohibiting the free exercise thereof .... " U.S. Const. amend. I.

The Court noted that the first amendment prohibited more than governmental preference of one religion over another. Rather, the first amendment was intended " 'to create a complete and permanent separation of the spheres of religious activity in civil authority by comprehensively forbidding every form of public aid or support for religion.' " *Id.* 374 U.S. at 217, 83 S.Ct. at 1568 (quoting *Everson v. Board of Education,* 330 U.S. 31–2, 67 S.Ct. 519 (1947)). The Court reviewed several of its precedents which touched on the establishment of religion, and concluded that " '[t]here cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the "free exercise" of religion and an "establishment" of religion are concerned the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute.' " *Id.* 374 U.S. at 219–20, 83 S.Ct. at 1569–70 (quoting *Zorach v. Clauson,* 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952)). The Court in *Abington* reasoned from its own precedent rather than independently reviewing the historical foundation of the first and the fourteenth amendments. The Court held that the Bible reading and the recitation of the Lord's Prayer in both cases were religious exercises. The "rights," *id.* at 224, 83 S.Ct. at 1572, of the plaintiffs were being violated. The religious character of the Bible reading and the recitation of the Lord's Prayer were not mitigated by the fact that students were allowed to absent themselves from their homerooms upon request of their parents. "The breach of neutrality that is today a trickling stream may all too soon become a raging torrent .... " *Id.* at 225, 83 S.Ct. at 1573.

The principles enunciated in *Engel v. Vitale, Abington v. Schempp,* and *Murray v. Curlett* have been distilled to this: "To pass muster under the Establishment Clause, the governmental activity must, first, reflect a clearly secular governmental purpose; second, have a primary effect that neither advances nor inhibits religion; and third, avoid excessive government entanglement with religion. *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973)." *Hall v. Board of School Commissioners,* 656 F.2d 999, 1002 (5th Cir.1981). "If a statute [or official administrative directive] violates *any* of these three principles, it must be struck down under the Establishment Clause." *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980) (holding that a Kentucky statute requiring posting of copy of Ten Commandments on walls of each public school classroom in state had pre-eminent purpose which was plainly religious in nature, and statute was thus violative of establishment clause and that avowed secular purpose was not sufficient to avoid conflict with first amendment; emphasis added).

Indeed, in this circuit, prayer in public schools is per se unconstitutional. "Prayer is an address of entreaty, supplication, praise, or thanksgiving directed to some sacred or divine spirit, being, or object. That it may contemplate some wholly secular objective cannot alter the inherently religious character of the exercise." *Karen B. v. Treen,* 653 F.2d 897, 901 (5th Cir.1981).

In sum, under present rulings the use of officially-authorized prayers or Bible readings for motivational purposes constitutes a direct violation of the establishment clause. Through a series of decisions, the courts have held that the establishment clause was designed to avoid any official sponsorship or approval of religious beliefs. Even though a practice may not be coercive, active support of a particular belief raises the danger, under the rationale of the Court, that state-approved religious views may be eventually established.

Although a given prayer or practice may not favor any one sect, the principle of neutrality in religious matters is violated under these decisions by any program which places tacit government approval upon reli-

gious views or practices. While the purpose of the program might be neutral or secular, the effect of the program or practice is to give government aid in support of the advancement of religious beliefs. Thus the programs are held invalid without any consideration as to whether they excessively entangle the state in religious affairs.

In contrast, the Supreme Court has permitted the use of the Bible in a literature course where the literary aspects of the Bible are emphasized over its religious contents. *Abington School District v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963). So long as the study does not amount to prayer or the advancement of religious beliefs, a teacher may discuss the literary aspects of the Bible in a secular course of study. Finally, the Supreme Court permits religious references in official ceremonies, including some school exercises, on the basis that these references are part of our secularized traditions and thus will not advance religion. *Engel v. Vitale,* 370 U.S. 421, 435 n. 21, 82 S.Ct. 1261, 1269 n. 21, 8 L.Ed.2d 601 (1962).

In the face of this precedent the defendants argue that school prayers as they are employed are constitutional. The historical argument which they advance takes two tacks. First, the defendants urge that the first amendment to the U.S. Constitution was intended only to prohibit the *federal government* from establishing a *national* religion. Read in its proper historical context, the defendants contend that the first amendment has no application to the states. The intent of the drafters and adoptors of the first amendment was to prevent the establishment of a national church or religion, and to prevent any single religious sect or denomination from obtaining a preferred position under the auspices of the federal government.

The corollary of this historical intent, according to the defendants, was to allow the states the freedom to address the establish-

ment of religions as an individual prerogative of each state. Stated differently, the election by a state to establish a religion within its boundaries was intended by the framers of the Constitution to be a power reserved to the several states.

Second, the defendants argue that whatever prohibitions were initially placed upon the federal government by the first amendment that those prohibitions were not incorporated against the states when the fourteenth amendment became law on July 19, 1868. The defendants have introduced the Court to a mass of historical documentation which all point to the intent of the Thirty-ninth Congress to narrowly restrict the scope of the fourteenth amendment. In particular, these historical documents, according to the defendants, clearly demonstrate that the first amendment was never intended to be incorporated through the fourteenth amendment to apply against the states. The Court shall examine each historical argument in turn.

In the alternative, the defendant-intervenors argue that if the first amendment does bar the states from establishing a religion then the Mobile County schools have established or are permitting secular humanism, *see infra* note 41 (discussion of secular humanism), to be advanced in the curriculum and, being a religion, it must be purged also. Such a purge, maintain the defendant-intervenors, is nigh impossible because such teachings have become so entwined in every phase of the curriculum that it is like a pervasive cancer. If this must continue, say the defendant-intervenors, the only tenable alternative is for the public schools to allow the alternative religious views to be presented so that the students might better make more meaningful choices.

### C. First Amendment as Forbidding Absolute Separation [5]

" '[T]he real object of the [F]irst amendment was not to countenance, much less to

---

**5.** At the start the Court should acknowledge its indebtedness to several constitutional scholars. If this opinion will accomplish its intent, which is to take us back to our original historical

roots, then much of the credit for the vision lies with Professor James McClellan and Professor Robert L. Cord. Their work and the historical sources cited in their work have proven invalu-

advance Mohammedanism, or Judaism, or infidelity, by prostrating Christianity, but to exclude all rivalry among *Christian* sects and to prevent any *national* ecclesiastical establishment which would give to an hierarchy the exclusive patronage of the *national* government.' " [6] The establishment clause was intended to apply only to the federal government. Indeed when the Constitution was being framed in Philadelphia in 1787 many thought a bill of rights was unnecessary. It was recognized by all that the federal government was the government of enumerated rights. Rights not specifically delegated to the federal government were assumed by all to be reserved to the states. Anti-Federalists, however, insisted upon a Bill of Rights as additional protection against federal encroachment upon the rights of the states and individual liberties. Excerpted testimony of James McClellan at 5–6 (trial testimony).

The federalists, who were the proponents of the Constitution, acceded to the demand of the Anti-Federalists for a Bill of Rights since, in the opinion of all, nothing in the Bill of Rights changed the terms of the original understanding of the federal convention. It was thought by all that the Bill of Rights simply made express what was already understood by the convention: namely, the federal government was a government of limited authority and that authority did not include matters of civil liberty such as freedom of speech, freedom of the press, and freedom of religion. *Id.* at 8–13.

The prohibition in the first amendment against the establishment of religion gave the states, by implication, full authority to determine church-state relations within their respective jurisdictions. "Thus the establishment clause actually had a dual purpose: to guarantee to each *individual* that Congress would not impose a national religion, and to each *state* that it was free to define the meaning of religious establishment under its own state constitution and laws. The federal government, in other words, simply had no authority over the states respecting the matter of church-state relations." [7]

At the beginning of the Revolution established churches existed in nine of the colonies. Maryland, Virginia, North Carolina, South Carolina, and Georgia all shared Anglicanism as the established religion common to those colonies. *See* McClellan, *supra* note 6, at 300. Congregationalism was the established religion in Massachusetts, New Hampshire, and Connecticut. New York, on the other hand, allowed for the establishment of Protestant religions. [8] Three basic patterns of church-state relations dominated in the late eighteenth century. In most of New England there was the quasi-establishment of a specific Protestant sect. Only in Rhode Island and Virginia were all religious sects disestablished. "But all of the states still retained the Christian religion as the foundation stone of their social, civil and political institutions. Not even Rhode Island and Virginia renounced Christianity, and both states continued to respect and acknowledge the

---

able to the Court in this opinion. *See* R. Cord, *Separation of Church and State: Historical Fact and Current Fiction* (1982); P. McGuigan & R. Rader, *A Blueprint for Judicial Reform* (eds. n.d.); J. McClellan, *Joseph Story and the American Constitution,* 118–159 (1971) (Christianity and the Common Law).

**6.** McClellan, The *Making and the Unmaking of the Establishment Clause,* in *Blueprint for a Judicial Reform* 295 (P. McGuigan & R. Rader eds. n.d.) (quoting J. Story, III, *Commentaries on the Constitution* § 1871 (1833) (emphasis added)).

**7.** *Id.*

**8.** *Id.* at 300. Professor McClellan documents in great detail the political struggle which raged through the various colonies during the Revolution and afterwards to disestablish certain religions throughout the colonies. The establishment of one religion over another in the respective colonies was purely a political matter. The political strength of the various followers determined which religion was established. Like any other political decision, when the political strength of the minorities reached that of the majority, the state disestablished what had formerly been the majority religion. *See e.g., id.* at 301–308.

Christian religion in their system of laws." [9] At the time the Constitution was adopted ten of the fourteen states refused to prefer one Protestant sect over another. Nonetheless, these states placed Protestants in a preferred status over Catholics, Jews, and Dissenters.[10]

The pattern of church-state relations in new states entering the Union after 1789 did not differ substantially from that in the original fourteen. By 1860—and the situation did not radically change for the next three quarters of a century—the quasi-establishment of a specific Protestant sect had everywhere been rejected; quasi-establishment of the Protestant religion was abandoned in most but not all of the states; and the quasi-establishment of the Christian religion still remained in some areas. A new pattern of church-state relations, the multiple or quasi-establishment of all religions in general, i.e., giving all religious sects a preferred status over disbelievers (the No Preference Doctrine) became widespread throughout most of the Union. Thus at the turn of the century, for example, no person who denied the existence of God could hold office in such states as Arkansas, Mississippi, Texas, North Carolina, or South Carolina.[11]

▪ The first amendment in large part was a guarantee to the states which insured that the states would be able to continue whatever church-state relationship existed in 1791. Excerpted testimony of James McClellan at 13 (from trial).

D. *Washington, Madison, Adams, and Jefferson*

The drafters of the first amendment understood the first amendment to prohibit the federal government only from establishing a national religion. Anything short of the outright establishment of a national religion was not seen as violative of the first amendment. For example, the federal government was free to promote various Christian religions and expend monies in an effort to see that those religions flourished. This was not seen as violating the establishment clause. R. Cord, *Separation of Church and State* 15 (1982).

The intent of the framers of the first amendment can be understood by examining the legislative proposals offered contemporaneously with the debate and adoption of the first amendment. For instance, one of the earliest acts of the first House of Representatives was to elect a chaplain. James Madison was a member of the congressional committee who recommended the chaplain system. On May 1, 1789 the House elected as chaplain, the Reverend William Linn. $500.00 was appropriated from the federal treasury to pay his salary. Even though the first amendment did not become part of the Constitution until 1791, had James Madison believed in the absolute separation of Church and State as some historians have attributed to him, James Madison would certainly have objected on this principle alone to the election of a chaplain.[12] At the Constitutional Convention on June 28, 1787 Dr. Benjamin Franklin suggested that a morning prayer might speed progress during the debates. Franklin told the Convention and its President, George Washington, that he had lived a long time. The longer he lived the more persuaded he was "*that God Governs in the affairs of men.*" [13] Franklin "therefore beg[ged] leave to move—that henceforth prayers imploring the assistance of Heaven, and its blessings on our deliberations, be

9. *Id.* at 307.

10. *Id.*

11. *Id.* at 311. Professor McClellan cites numerous examples in which the states required adherence to a Christian religion. For instance, witnesses were considered competent to testify only if they affirmed a belief in the existence of a Christian God. *Id.*

12. R. Cord, *supra* note 5, at 23.

13. R. Cord, *supra* note 5, at 24 (quoting *Debates in the Federal Convention of 1787* as reported by James Madison, *Documents Illustrative of the Formation of the Union of the American States* (Washington, D.C.: Government Printing Office, (1927) 295–96 (emphasis in original)).

held in this Assembly every morning before we proceed to business, and that one or more of the clergy of this City be requested to officiate in that Service—"[14] Franklin's motion was not adopted for political reasons. Alexander Hamilton and others thought that the motion might have been proper at the beginning of the convention but that if the motion were adopted during the convention the public might believe that the convention was near failure. For this reason, which was wholly political, the issue was resolved by adjournment without any vote being taken.[15]

Presidential proclamations, endorsed by Congressman James Madison when Washington was President, dealing with Thanksgiving, fasting, and prayer are all important in understanding Madison's views on the proper role between church and state.[16] Congress proposed a joint resolution on Sep-

tember 24, 1789, which was intended to allow the people of the United States an opportunity to thank Almighty God for the many blessings which he had poured down upon them. The resolution requested that President George Washington recommend to the citizens of the United States a day of public thanksgiving and prayer. Congress intended that the people should thank Almighty God for affording them an opportunity to establish this country.[17] This proclamation was submitted to the President the very day after Congress had voted to recommend to the states the final text of what was to become the first amendment to the United States Constitution.[18] As President, Madison issued four prayer proclamations. Excerpted testimony of James McClellan at 19.

Thomas Jefferson is often cited along with James Madison as a person who was

14. *Id.* at 24–25.

15. *Id.*

16. The views of James Madison are often cited by those who insist upon absolute separation between church and state. Madison was one of the drafters of the first amendment. An uncritical, cursory examination of some of Madison's writings would lead one to the conclusion that Madison favored absolute separation between church and state. However, to reach this conclusion is to misunderstand the views of Mr. Madison.

As Professor Cord explains in his book, Madison was concerned only that the federal government should not establish a national religion. Nondiscriminatory aid to religion and support for various Christian religions was not viewed by Madison as unlawful. *See* R. Cord, *supra* note 5, at 25–26 (examining drafts of the establishment clause submitted by Madison).

17. Professor Cord explains in great detail the circumstances surrounding this presidential proclamation. *See* R. Cord, *supra* note 5, at 27–29.

18. Professor Cord discusses in detail a document which Madison wrote late in his life known as the *Detached Memoranda.* Some historians have taken the *Detached Memoranda* as a blanket condemnation of religious proclamations issued by Presidents Jefferson, Madison, and Jackson. From this, some historians argue that James Madison believed that absolute separation was mandated by the establishment clause. The Supreme Court has relied upon the *Detached Memoranda* to justify its position of absolute separation in *Abington*

*School District v. Schempp,* 374 U.S. 203, 225 (1963) ("[I]n the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.' ").

Professor Cord suggests that the *Detached Memoranda* reflected nothing more than a shift in Madison's views as he grew older. The *Detached Memoranda* was written long after Madison had left office and long after the first amendment had been drafted. R. Cord, *supra* note 5, 29–36.

The explanation of Professor Cord that Madison is an old man, no longer in office, who regretted some of his past actions, is, to the Court, reasonable. Not all historical facts can easily be squared. Professor Cord emphasizes his point by analogizing to something which former President Nixon might write upon reflecting on his tenure as president. It would be odd, hypothesizes Professor Cord, if Mr. Nixon were to publish a book in his later years which concluded that taping conversations, without all parties being aware of the recording, is morally wrong and clearly a flagrant violation of the constitutional right to privacy. It would be nonsense, in the view of Professor Cord, for a Nixon biographer to conclude that Richard Nixon believed that the surreptitious tapings of conversations in the Oval Office were immoral and unconstitutional. R. Cord, *supra* note 5, at 36. Similarly, it is faulty to judge what Madison believed to be the scope of the establishment clause at the time he drafted the clause by looking to views expressed late in his life when there are numerous expressions of his intent contemporaneous with the period in which the establishment clause was drafted.

absolutely committed to the separation of church and state. The historical record, however, does not bear out this conclusion.

While Jefferson undoubtedly believed that the church and the state should be separate, his actions in public life demonstrate that he did not espouse the absolute separation evidenced in the modern decisions by the United States Supreme Court. For example, on October 31, 1803, President Jefferson proposed to the United States Senate a treaty with the Kaskaskia Indians which provided that federal money was to be used to support a Catholic priest and to build a church for the ministry of the Kaskaskia Indians. The treaty was ratified on December 23, 1803. As Professor Cord points out in his book,[19] President Jefferson could have avoided the explicit appropriation of funds to support a Catholic priest and a Catholic church by simply leaving a lump sum in the Kaskaskia treaty which could have been used for that purpose. However, President Jefferson was not at all reluctant—for ought that appears on the historical record—to specifically appropriate money for a Catholic mission.

Unlike Presidents Washington, Madison, and Adams, when Jefferson was President he broke with the tradition of issuing executive religious proclamations. In Jefferson's view the establishment clause and the federal division of power between the national government and the states foreclosed executive religious proclamations. While refusing to issue executive religious proclamations, President Jefferson recognized that "no power to prescribe any religious exercise, or to assume authority in religious discipline, has been delegated to the General Government. It must then rest with the

States, as far as it can be in any human authority."[20] Thus, of the first four Presidents, all of whom were close to the adoption of the Federal Constitution and the first amendment, only President Jefferson did not issue executive religious proclamations, and only President Jefferson thought that executive religious proclamations were not constitutional.

But even President Jefferson signed into law bills which provided federal funds for the propagation of the gospel among the Indians.[21] Based upon this historical record Professor Cord concludes that Jefferson, even as President, did not interpret the establishment clause to require complete independence from religion in government.

In sum, while both Madison and Jefferson led the fight in Virginia for the separation of church and state, both believed that the first amendment only forbade the establishment of a state religion by the *national* government. "Jefferson was neither at the Constitutional Convention nor in the House of Representatives that framed the First Amendment. The two Presidents who were at the Convention, Washington and Madison, and the President who framed the initial draft of the First Amendment in the House of Representatives, James Madison, issued Thanksgiving Proclamations."[22] The Court agrees with the studied conclusions of Dr. Cord that "it should be clear that the traditional interpretation of Madison and Jefferson is historically faulty if not virtually unfounded . . . ."[23]

One thing which becomes abundantly clear after reviewing the historical record is that the founding fathers of this country and the framers of what became the first amendment never intended the establish-

---

**19.** R. Cord, *supra* note 5, at 37–39.

**20.** R. Cord, *supra* note 5, at 40 (quoting Letter to a Presbyterian Clergyman (1808)).

**21.** Professor Cord chronicles the federal support provided to the Moravian Brethren at Bethlehem in Pennsylvania. The function of the Brethren was to civilize the Indians and to promote Christianity. First passed on July 27, 1787, the resolution supporting the Brethren was supported by every President, including Thomas Jefferson. The legislation supporting

the Brethren was sectarian in character. Professor Cord reads this history to conclude that had this sort of interaction between church and state been thought to be unconstitutional then certainly the early Congresses and Presidents would not have authorized expenditure of federal money. R. Cord, *supra* note 5, at 39–46.

**22.** R. Cord, *supra* note 5, at 47.

**23.** *Id.*

ment clause to erect an absolute wall of separation between the federal government and religion. Through the chaplain system, the money appropriated for the education of Indians, and the Thanksgiving proclamations, the federal government participated in secular Christian activities. From the beginning of our country, the high and impregnable wall which Mr. Justice Black referred to in *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947), was not as high and impregnable as Justice Black's revisionary literary flourish would lead one to believe.

Yet, despite all of this historical evidence, only last month the Supreme Court wrote that the purpose of the first amendment is

> twofold: to foreclose state interference with the practice of religious faiths, and to foreclose the establishment of a state religion familiar in other Eighteenth Century systems. Religion and government, each insulated from the other, could then coexist. *Jefferson's idea of a "wall," see Reynolds v. United States,* 98 U.S. (8 Otto) 145, 164 [25 L.Ed. 244] (1878), *quoting* Reply from Thomas Jefferson to an address by a committee of the Danbury Baptist Association (January 1, 1802), *reprinted in* 8 Works of Thomas Jefferson 113 (Washington ed. 1861), *was a useful figurative illustration* to emphasize the concept of separateness. Some limited and incidental entanglement between church and state authority is inevitable in a complex modern society, *see, e.g., Lemon v. Kurtzman,* 403 U.S. 602, 614 [91 S.Ct. 2105, 2112, 29 L.Ed.2d 745] (1971); *Walz v. Tax Commission,* 397 U.S. 664,

670 [90 S.Ct. 1409, 1412, 25 L.Ed.2d 697] (1970), *but the concept of a "wall" of separation is a signpost.*

*Larkin v. Grendel's Den, Inc.,* —— U.S. ——, ——, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982) (emphasis added). Enough is enough. Figurative illustrations should not serve as a basis for deciding constitutional issues.

■ For this Court, Professor Robert Cord, *see supra* note 5, irrefutably establishes that Thomas Jefferson's address to the Danbury Baptist Association cannot be relied upon to support the conclusion that Jefferson believed in a *wall* between church and state. "By this phrase Jefferson could only have meant that the 'wall of separation' was erected 'between Church and State' in regard to possible federal action such as a law establishing a national religion or prohibiting the free exercise of worship." *Id.* at 115. Overall the conduct of Thomas Jefferson was consistent with the conclusion that he believed, like all the other drafters of the Constitution and the Bill of Rights, that the states were free to establish religions as they saw fit.[24]

**E. First Amendment as Applied to the States**

■ As has been seen up to this point the establishment clause, as ratified in 1791, was intended only to prohibit the federal government from establishing a national religion. The function of the establishment clause was two-fold. First, it guaranteed to each individual that Congress would not impose a national religion. Second, the establishment clause guaranteed to each state

---

**24.** Since the states were historically free to establish a religion it follows that some irritation by non-believers or those in the religious minority was a necessary consequence of establishment. The complaint alleges that "[a]ll of the minor Plaintiffs are exposed to ostracism from their peer group class members if they do not participate in these daily devotional activities." Complaint at 5. The children "all have suffered and continue to suffer severe emotional distress from being forced to participate, via peer group pressure, in devotional observances orchestrated by the defendants." *Id.* at 7. This psychological pressure naturally flows anytime a state takes an official position on an

issue. It does not make an establishment unconstitutional. For example, laissez-faire industrialists feel coerced when a state adopts tough environmental laws. Unemployed workers feel pressure from peer groups when the unemployed worker takes advantage of a state labor law which allows him to cross a union picket line to break a strike. Someone, somewhere, feels coerced or pressured anytime the state takes a position. The Constitution, however, does not protect people from feeling uncomfortable. A member of a religious minority will have to develop a thicker skin if a state establishment offends him. Tender years are no exception.

that the states were free to define the meaning of religious establishment under their own constitutions and laws.

The historical record clearly establishes that when the fourteenth amendment was ratified in 1868 that its ratification did not incorporate the first amendment against the states. The debates in Congress at the time the fourteenth amendment was being drafted, the re-election speeches of the various members of Congress shortly after the passage by Congress of the fourteenth amendment, the contemporaneous newspaper stories reporting the effect and substance of the fourteenth amendment, and the legislative debates in the various state legislatures when they considered ratification of the fourteenth amendment indicate that the amendment was not intended to apply the establishment clause against the states because the fourteenth amendment was not intended to incorporate the federal Bill of Rights (the first eight amendments) against the states.

At the beginning the Court should acknowledge its indebtedness to Professor Charles Fairman, then a professor of law in Political Science at Stanford University, for the scholarly article which he published in 1949.[25] Professor Fairman examined in detail the historical evidence which Mr. Justice Black relied upon in *Adamson v. California*, 332 U.S. 46, 47, 67 S.Ct. 1672, 1673, 91 L.Ed. 1903 (1947), where Mr. Justice Black concluded that the historical events that culminated in the adoption of the fourteenth amendment demonstrated persuasively that one of the chief objects of the fourteenth amendment was to make the Bill of Rights applicable to the states.[26]

### 1. *Debates*

The paramount consideration in defining the scope of any constitutional provision or legislative enactment is to ascertain the in-

**25.** Fairman, *Does the Fourteenth Amendment Incorporate the Bill of Rights?* 2 Stan.L.Rev. 5 (1949).

**26.** Mr. Justice Black spent nearly twenty years mulling over the criticisms leveled by Professor Charles Fairman. Finally, he had this to say:

What I wrote [in *Adamson v. California*, 332 U.S. 46, 47 [67 S.Ct. 1672, 1673, 91 L.Ed. 1903] (1947),] in 1947 was the product of years of study and research. My appraisal of the legislative history [which surrounded the adoption of the fourteenth amendment and upon which Mr. Fairman relied so heavily] followed 10 years of legislative experience as a Senator of the United States, not a bad way, I suspect, to learn the value of what is said in legislative debates, committee discussions, committee reports, and various other steps taken in the course of passage of bills, resolutions, and proposed constitutional amendments. My Brother Harlan's objections to my *Adamson* dissent history, like that of most of the objectors, relies most heavily on a criticism written by Professor Charles Fairman and published in the Stanford Law Review. 2 Stan.L.Rev. 5 (1949). I have read and studied this article extensively, including the historical references, and am compelled to add that in my view it has completely failed to refute the inferences and arguments that I suggested in my *Adamson* dissent. Professor Fairman's "history" relied very heavily on what was "not" said in the state legislatures that passed on the Fourteenth Amendment. Instead of relying on this kind of negative pregnant, my legislative experience has convinced me that it is far wiser to rely on what "was" said, and most importantly, said by the men who actually sponsored the Amendment in the Congress. I know from my years in the United States Senate that it is to men like Congressman Bingham, who steered the amendment through the House, and Senator Howard, who introduced it in the Senate, that members of Congress look when they seek the real meaning of what is being offered. And they vote for or against a bill based on what the sponsors of that bill and those who oppose it tell them it means. The historical appendix to my "Adamson" dissent leaves no doubt in my mind that both its sponsors and those who opposed it believed the Fourteenth Amendment made the first eight amendments of the Constitution (the Bill of Rights) applicable to the states.

*Duncan v. Louisiana*, 391 U.S. 145, 165–66, 88 S.Ct. 1444, 1455–56, 20 L.Ed.2d 491 (1968) (Black, J., dissenting).

Charles Fairman "conclusively disproved Black's contention, at least, such as the weight of the opinion among disinterested observers." A. Bickel, *The Least Dangerous Branch* 102 (1962). Along with Alexander Bickel, Professor Raoul Berger agrees that Charles Fairman's analysis was right on the mark. R. Berger, *Government by Judiciary: The Transformation of the Fourteenth Amendment*, 137 n. 11 (1977).

tent of the legislature. The intention of the legislature may be evidenced by statements of the leading proponents.[27] If statements of the leading proponents are found, those statements are to be regarded as good as if they were written into the enactment. "The intention of the lawmaker is the law." *Hawaii v. Mankichi,* 190 U.S. 197, 212, 23 S.Ct. 787, 788, 47 L.Ed. 1016 (1903).

Looking back, what evidence [i]s there ... to sustain the view that Section 1 was intended to incorporate Amendments I to VIII? [C]ongressman Bingham ... did a good deal of talking about "immortal bill of rights" and one spoke of "cruel and unusual punishments." Senator Howard, explaining the new privileges and immunities clause, said that it included the privileges and immunities of Article IV, Section 2—"whatever they may be"—and also "the personal rights guarantied [*sic*] and secured by the first eight amendments ...." That is all. The rest of the evidence bore in the opposite direction, or was indifferent. Yet one reads in Justice Black's footnotes that, [*Adamson v. California,* 332 U.S. 46, 72 n. 5 [67 S.Ct. 1672, 1686 n. 5, 91 L.Ed. 1903] (1947)],

A comprehensive analysis of the historical origins of the Fourteenth Amendment, Flack, The Adoption of the Fourteenth Amendment (1908), 94, concludes that "Congress, the House and the Senate, had the following objects and motives in view for submitting the first section of the Fourteenth Amendment to the States for ratification:

1. To make the Bill of Rights (the first eight Amendments) binding upon, or applicable to, the States.

2. To give validity to the Civil Rights Bill.

3. To declare who were citizens of the United States.

We have been examining the same materials as did Flack, and have quoted far more extensively than he. How can he on that record reach the conclusion that Congress proposed by Section 1 to incorporate Amendments I to VIII?

Fairman, *Does the Fourteenth Amendment Incorporate the Bill of Rights,* 2 Stan.L. Rev. at 65–66 (1949). Professor Flack explained that the incorporation was based upon remarks of Congressman Bingham and Senator Howard at the time the Thirty-ninth Congress voted upon the fourteenth amendment. Only those two said anything which could be construed as suggesting the result reached by Justice Black and the modern Supreme Court decisions.

Throughout the debates in the House over the meaning of the fourteenth amendment Professor Fairman shows convincingly that Congressman Bingham had no clear concept of what exactly would be accomplished by the passage of the fourteenth amendment. The explanations offered by Congressman Bingham to his colleagues were inconsistent and contradictory.[28]

**27.** For example, Professor Raoul Berger cites several cases which recite this common principle of construction. *See e.g., Wright v. Vinton Branch,* 300 U.S. 440, 463, 57 S.Ct. 556, 562, 81 L.Ed. 736 (1937); *Wisconsin Railroad Commission v. C.B. & Q. RR. Co.,* 257 U.S. 563, 589, 42 S.Ct. 232, 238, 66 L.Ed. 371 (1922). *See* R. Berger, *supra* note 26, at 136–37 & 137 n. 13.

**28.** Professor Fairman has quoted exhaustively from the Congressional Globe. The various speeches of Congressman Bingham made in support of the fourteenth amendment are quoted in detail. See Fairman, *Does the Fourteenth Amendment Incorporate the Bill of Rights?* 2 Stan.L.Rev. 5, 24–25 (1949).

The analysis of Professor Fairman is attacked vigorously by William Crosskey, then a profes-

sor of law at the University of Chicago Law School. Crosskey, *Charles Fairman, "Legislative History," and the Constitutional Limitations on State Authority* 22 U.Chi.L.Rev. 1 (1954). Crosskey quotes at length from the Bingham article and from the *Congressional Globe* in an effort to discredit the explanation offered the historical facts by Professor Bingham.

The debate between the two scholars was pitched. Much of Crosskey's analysis consisted of little more than *ad homineum* attacks on Professor Fairman. The attacks were answered in a reply article written by Professor Fairman. Fairman, *A Reply to Professor Crosskey,* 222 U.Chi.L.Rev. 144 (1954). After reading the original articles of both Fairman and Crosskey, the rebuttal of Fairman, and many other arti-

Together with Congressman Bingham's statements which suggested incorporation were remarks by Senator Howard. Senator Howard spoke with more preciseness than Congressman Bingham. Thus, his interpretation carries much greater weight than that of Congressman Bingham. Yet, because of the circumstances under which he spoke, his statements are subject to question when held out as representative of the majority viewpoint. By sheer chance Senator Howard acted as spokesman for the joint committee when explaining the purpose of the fourteenth amendment to the Senate. The joint committee had been chaired by Senator Fessenden. Chairman Fessenden became sick suddenly and Senator Howard thus became the spokesman for the Joint Committee. "Up to this point [Senator Howard's] participation in the debates on the Civil Rights Bill and the several aspects of the Amendment had been negligible. Poles removed from Chairman Fessenden, who 'abhorred' extreme radicals,

Howard ... was 'one of the most ... reckless of the radicals,' who had 'served consistently in the vanguard of the extreme Negrophiles.' " [29] Professor Raoul Berger notes with some sarcasm that it is odd that a radical such as Senator Howard should be taken as speaking authoritatively for a committee in which the conservatives outnumbered the radicals and where there was a strong difference of opinion between the radicals and the conservatives. R. Berger, *supra* note 26, at 147.

On May 23, 1866, Senator Howard rose in the Senate, referred to the illness of Fessenden, and stated that he would "present 'the views and the motives which influenced the committee, so far as I understand [them].' After reading the privileges and immunities listed in *Corfield v. Coryell*, [6 Fed.Cas. 546, No. 3230 (C.C.E.D.Pa.1823),] he said, 'to these privileges and immunities ... should be added the personal rights guaranteed and secured by the first eight amendments.' That is the sum and sub-

cles on the question, the Court is persuaded that the weight of the disinterested scholars supports the analysis of Professor Fairman. The work of Professor Crosskey impresses the Court as being designed to reach a result. Namely, Crosskey was interested in providing a constitutional basis to support the desegregation decision of the United States Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). For instance, in an effort to explain a serious ambiguity in a Bingham speech, Professor Crosskey explains that the speech would make perfect sense if one assumes that Bingham had been reading directly from a text of the Constitution, that he had a copy of the document in his hand and that he was waving the copy while he spoke in Congress. "You're fudging, Professor Crosskey! You don't know that Bingham had been *reading* from the Constitution." Fairman, *A Reply to Professor Crosskey*, 22 U.Chi.L.Rev. 144, 152 (1949).

One scholar, Michael Kent Curtis, argues that Professor Raoul Berger has improperly analyzed the incorporation question by blindly following the lead of Charles Fairman and ignoring the work of William Crosskey. Curtis, *The Bill of Rights as a Limitation on State Authority: A Reply to Professor Berger*, 16 Wake Forest L.Rev. 45 (1980). No lesser a light than Henry M. Hart, Jr., then a professor of law at Harvard Law School, remarked that "[t]he Don Quixote of Chicago breaks far too many lances in his on-slaughts upon the wind-

mills of constitutional history to permit detailed review of each adventure." Hart, Book Review, 67 Harv.L.Rev. 1456 (1954). While the comment was, strictly speaking, directed to a recently released book by Professor Crosskey, the thrust of the comment holds true for the scholarship of Professor Crosskey. Professor Henry Hart had little use for the typical analytical method employed by Professor Crosskey: slanderous, *ad homineum* attacks on those historical actors who supported views contrary to those which Professor Crosskey expected to find in a historical record. Professor Hart compared Professor Crosskey to Senator Joseph McCarthy from Wisconsin. *Id.* at 1475 ("In the true hit-and-run style popularized by the Senator from the adjacent state to the north, [Wisconsin being north of Illinois] Professor Crosskey, having made th[e] ugly charge [that James Madison deliberately, not inadvertently, falsified some of his notes in 1836 to suit his own purposes at that time], promises to consider in a later volume whether it is true.") Professor Hart is of the general opinion that the scholarship of Professor Crosskey amounted to little more than "a confident tone, nice printing, and an abundance of notes and appendices referring to obscure documents and esoteric word meanings." *Id.* at 1486.

29. R. Berger, *supra* note 26, at 147 (footnotes omitted).

stance of Howard's contribution to the 'incorporation' issue." [30]

Raoul Berger notes in his analysis of the incorporation question that the remark of Senator Howard was tucked away in the middle of a long speech, that Howard was a last minute substitution for the majority chairman, that Howard was in the minority on the committee, and that after Howard was through speaking Senator Poland stated that the fourteenth amendment secured nothing beyond what was intended in the original privileges and immunities clause of Article IV Section 2. R. Berger, *supra* note 26, 148–49. Senator Doolittle followed Senator Poland with some additional remarks which were designed to reassure those whose votes had already been won in favor of passage of the fourteenth amendment that indeed the amendment was limited to known objectives, which objectives were not intended to encompass the federal Bill of Rights.

The scholarly analyses of Professors Fairman and Berger persuasively show that Mr. Justice Black misread the congressional debate surrounding the passage of the fourteenth amendment when he concluded that Congress intended to incorporate the federal Bill of Rights against the states. *See infra* p. 42–44 (discussion of Blaine Amendment). So far as Congress was concerned, after the passage of the fourteenth amendment the states were free to establish one Christian religion over another in the exercise of their prerogative to control the establishment of religions.

### 2. *Popular Understanding*

An examination of popular sentiment across the country reveals that the nation as a whole did not understand the adoption of the fourteenth amendment to incorporate the federal Bill of Rights against the states. Inferentially, that is to say that the people understood that each state was free to continue to support one Christian religion over another as the people of that state saw fit to do. The leading constitutional scholar upon whom Justice Black relied in *Adamson v. California,*

> Mr. Flack[,] examined a considerable number of Northern newspapers and reported (an admission against the thesis he was defending) the following observation: "There does not seem to have been any statement at all as to whether the first eight Amendments were to be made applicable to the States or not . . . ." Presumably this excluded the press reports of May 24 on Senator Howard's speech of the 23d: for the *New York Herald* and the *New York Times,* which Mr. Flack had before him, did quote in full the passage where it said that the personal rights guaranteed by the first eight amendments were among the "privileges and immunities."

> Other newspaper files have been examined in preparing the [article of Professor Fairman] and no instance has been found to vary what has been set out above.

Fairman, *supra* note 25, at 68 (footnotes omitted).[31]

---

**30.** R. Berger, *supra* note 26, at 147–48 (quoting *Congressional Globe* 2764–65).

**31.** Crosskey, *Charles Fairman, "'Legislative History'" and the Constitutional Limitations on State Authority,* 22 U.Chi.L.Rev. 1 (1954). In particular, Professor Crosskey is critical of the newspaper examination conducted by Professor Fairman. By Crosskey's count, Fairman and Flack together examined ten newspapers. *Id.* at 100–101. Crosskey points out that there were nearly 5,000 newspapers in circulation in 1870. Thus, if Flack and Fairman examined only ten of these newspapers then, concludes Crosskey, the two ignored a substantial source of evidence in their inquiry. Certainly, at the least, according to Crosskey, neither Flack nor

Fairman are entitled to make any conclusions about what the newspapers of the day reflected as the popular understanding of the effect of the fourteenth amendment.

The Court has studied the Crosskey criticism of Professor Fairman and rejects it. The work of the two scholars serves as the cornerstone for both camps in the debate vel non whether the fourteenth amendment was intended to incorporate the federal Bill of Rights. *Compare* R. Berger, *supra* note 26, 134–156 (rejecting incorporation of the federal Bill of Rights) *with* Curtis, *The Bill of Rights* as a *Limitation on State Authority: A Reply to Professor Berger,* 16 Wake Forest L.Rev. 45 (1980) (following Crosskey).

Charles Fairman quotes at length from the campaign speeches of five senators who, presumably, heard Senator Howard's speech of May 23, 1866. Not one of the senators mentioned anything about the Bill of Rights when commenting to the electorate about Section 1. Likewise, the five Republicans, including Congressman Bingham, never mentioned that the privileges and immunities clause would impose the federal Bill of Rights upon the states. Along with Professor Fairman, the Court takes the historical record to conclusively show that the general understanding of the nation at large, as illustrated by contemporaneous newspaper reports, demonstrates that the people of this country did not understand the fourteenth amendment to incorporate the establishment clause of the first amendment against the states.

### 3. Campaign Speeches

After the submission of the fourteenth amendment to the states on June 16, 1866 the members of the Thirty-ninth Congress began to busy themselves with the prospect of re-election in the fall. The statements which the members of Congress made during their campaign speeches are certainly relevant in ascertaining the intent of the Thirty-ninth Congress with regard to the scope and effect of the fourteenth amendment. All of these speeches were contemporaneous expressions of the intent of Congress. Professor Fairman provides many instances of speeches made on the campaign hustings. See generally, Fairman, supra note 25, at 68–78. None of the members of Congress indicated in their campaign speeches that the fourteenth amendment was intended to incorporate the federal Bill of Rights against the states. The general consensus with regard to the effect of the fourteenth amendment was that it covered the same ground as the Civil Rights Act of 1866. Id. at 72 (remarks of Senator Lyman Trumbull, the sponsor of the Civil Rights Bill).

### 4. State-Legislative Debates

The fourteenth amendment was submitted to the states for their ratification on June 16, 1866. By June, 1867, twelve legislatures had ratified the amendment. By July 28, 1868 the fourteenth amendment had been promulgated.

Professor Fairman combed the relevant legislative materials to see exactly what each state legislature thought the effect of the fourteenth amendment would be. Along with Fairman, the Court finds it important to note not only what was said but what was not said. Had the fourteenth amendment been understood to incorporate the federal Bill of Rights against the states in many instances states would have been required to make radical changes. For instance, it was frequent in many states for people to be prosecuted for felonies without an indictment from a grand jury. It was equally common for a jury of less than twelve people to sit in judgment in a felony prosecution. Some states failed to preserve the right to a jury trial and suits at common law where the amount in controversy exceeded $20.00.

The Court will not repeat Professor Fairman's analysis in each state. Only a few states need to be highlighted to convey the popular understanding of the effect of the fourteenth amendment upon the right of states to establish a religion. In New Hampshire, only five months after the promulgation of the fourteenth amendment—in December, 1868—the Supreme Court of New Hampshire had occasion to interpret a provision of the state constitution which provided that the legislature could "authorize towns, parishes, and religious societies 'to make adequate provision ... for the support and maintenance of public Protestant teachers of piety, religion, and morality.'"[32] Moreover, Article VI of the Bill of Rights from the New Hampshire Constitution encouraged "the public worship of the diety ...." The question before the Supreme Court of New Hampshire was whether certain parishioners of the First Unitarian Society of Christians in Dover

---

**32.** C. Fairman, supra note 25 at 86 (quoting N.H. Const. art. 6 (1793)).

could fire the preacher. The preacher had begun using text from Emerson interchangably with text from the Bible. While Wardens of the church supported the preacher, certain pew owners were outraged. The pew owners sought an injunction restraining the preacher from occupying the meeting house. The trial court granted relief.

On appeal, in a 276-page report neither the opinion of the court nor the dissent made a single reference to the fourteenth amendment. Both opinions, however, had much to say about New Hampshire's policy in ecclesiastical matters. The opinion of the court referred to the first amendment and quoted Story's *Commentaries:*

> [T]he whole power over the subject of religion is left exclusively to the State governments, to be acted upon according to their own sense of justice and the State constitutions . . . .
>
> Probably at the time of the adoption of the amendment now under consideration, the general if not the universal sentiment in America was, that Christianity ought to receive encouragement from the state, so far as not incompatible with the private rights of conscience and the freedom of religious worship.

Fairman, *supra* note 25, 87 (citations omitted).

As Professor Fairman notes: "[I]n December 1868—five months after the promulgation of the Fourteenth Amendment—the New Hampshire court regarded the matter of an establishment of religion as being still 'left exclusively to the State governments.'" *Id.*

■ The historical record shows without equivocation that none of the states envisioned the fourteenth amendment as applying the federal Bill of Rights against them through the fourteenth amendment. It is sufficient for purposes of this case for the Court to recognize, and the Court does so recognize, that the fourteenth amendment did not incorporate the establishment clause of the first amendment against the states.[33]

### 5. *Supreme Court Decisions*

Decisions by the United States Supreme Court rendered contemporaneously with the ratification of the fourteenth amendment indicate that the Court did not perceive the fourteenth amendment to incorporate the federal Bill of Rights against the states. In *Twitchell v. Pennsylvania,* 74 U.S. (7 Wall.) 321, 19 L.Ed. 223 (U.S.1869), the Supreme Court held that the fifth and sixth amendments of the Constitution do not apply to the states. This holding was consistent with the earlier, well-known holding in *Barron v. Baltimore,* 32 U.S. (7 Peters) 243, 8 L.Ed. 672 (1833).

In *Barron v. Baltimore* the question presented to the court was whether the City of Baltimore was required to compensate Barron under the fifth amendment for the taking of his property for public purposes. When the City of Baltimore paved some streets, streams of water had been diverted

---

**33.** It is always difficult to wade through the mass of historical research which has been done on both sides of the issue. For instance, while the defendant-intervenors introduced Professor Robert L. Cord's book, *Separation of Church and State: Historical Fact and Current Fiction* in support of the historical record upon which they are relying, Professor Cord concludes, in part, that a) the fourteenth amendment did incorporate the establishment clause against the states, *id.* at 101, and b) the Lord's Prayer, being distinctly Christian in character, or any other prayer which is readily identified with one religion rather than another is impermissible under the establishment clause, *id.* at 162–65.

The Court rejects the conclusion of Professor Cord that the fourteenth amendment incorporated the establishment clause against the states. Professor Cord uncritically adopted the analysis of the United States Supreme Court in reaching his conclusion. In only a footnote does Professor Cord refer to the scholarship of Professor Charles Fairman; then only does Professor Cord note that there has been some "controversy" surrounding the incorporation issue.

Assuming arguendo that the establishment clause had been incorporated against the states then Professor Cord would be correct in his conclusion that any activity which is religiously identifiable would be barred. *See infra* note 41 for the Court's discussion regarding secular humanism.

in the vicinity of Barron's wharf. The water had deposited large amounts of sand around the wharf. The sand deposits made these waters too shallow for ocean-going ships to load and unload cargo at the wharf. Chief Justice John Marshal held that Barron's claim raised no appropriate federal question because the fifth amendment was a constitutional limitation applied only against the federal government.[34]

Another decision of the United States Supreme Court, decided in 1870, recognized that the federal Bill of Rights did not control the states.[35] After much deliberation over the question whether jury findings made in state court were reviewable in federal court, the Supreme Court noted that it was "admitted" that the limitations of the seventh amendment[36] did not apply to the states.

## F. *Blaine Amendment*

The discussion up to this point has focused upon the incorporation of the federal Bill of Rights generally through the fourteenth amendment. Events which postdated the adoption of the fourteenth amendment show that the lawmakers of the Thirty-ninth Congress did not intend that the establishment clause would become binding upon the states with the ratification of the fourteenth amendment. " '[A] conclusive argument against the incorporation theory, at least as respects the religious provisions of the First Amendment, is the "Blaine Amendment" proposed in 1875.' " McClellan, *Christianity and the Common Law,* in Joseph Story and the American Constitution 118, 154 (1971) (quoting O'Brien, *Justice Reed and the First Amendment,* 116 (n.d.)). At the behest of President Grant, James Blaine of Maine introduced a resolution in the Senate in 1885 which read: "No *State* shall make any law respecting an establishment of religion or prohibiting the free exercise thereof." *Id.* at 154. (emphasis in original). Importantly, the Congress which considered the Blaine Amendment included twenty-three members of the Thirty-ninth Congress, the Congress which passed the fourteenth amendment.

Not one of the several Representatives and Senators who spoke on the proposal even suggested that its provisions were implicit in the amendment ratified just seven years earlier. Congressman Banks, a member of the Thirty-ninth Congress, observed: "If the Constitution is amended so as to secure the object embraced in the principle part of this proposed amendment, it prohibits the States from exercising a power they now exercise." Senator Frelinghuysen of New Jersey urged the passage of the "House article," which "prohibits the States for the first time, from the establishment of religion, from prohibiting its free exercise." Senator Stevenson, in opposing the proposed

---

**34.** In *Barron v. City of Baltimore,* the Court noted:

> But it is universally understood, it is a part of the history of the day, that the great revolution which established the Constitution of the United States was not effected without immense opposition. Serious fears were extensively entertained that those powers which the patriot statesmen who then watched over the interests of our country, deemed essential to union, and to the attainment of those invaluable objects for which union was sought, might be exercised in a manner dangerous to liberty. In almost every convention by which the Constitution was adopted, amendments to guard against the abuse of power were recommended. These amendments demanded security against the apprehended encroachments of the general government—not against those of the local governments.

> In compliance with a sentiment thus generally expressed, the quiet fears were thus extensively entertained, amendments were proposed by the required majority in congress, and adopted by the States. *These amendments contained no expression indicating an intention to apply them to the state governments.* This court cannot so apply them. *Barron v. City of Baltimore,* 32 U.S. (7 Pet.) 243, 250, 8 L.Ed. 672 (1883) (emphasis added).

**35.** *Justices of the Supreme Court of New York v. United States,* 65 U.S. (9 Wall.) 274, 19 L.Ed. 658 (1870).

**36.** In part the seventh amendment provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

amendment, referred to *Thomas Jefferson*: *"Friend as he* [Jefferson] *was of religious freedom, he would never have consented that the States . . . should be degraded and that the Government of the United States, a government of limited authority, a mere agent of the States with prescribed powers, should undertake to take possession of their schools and of their religion."* Remarks of Randolph, Christiancy, Kernan, Whyte, Bogy, Easton, and Morton give confirmation to the belief that none of the legislators in 1875 thought the Fourteenth Amendment incorporated the religious provisions of the First.

*Id.* (quoting O'Brien, *Justice Reed and the First Amendment* 116–17 (emphasis added)).

The Blaine Amendment, which failed in passage, is stark testimony to the fact that the adoptors of the fourteenth amendment never intended to incorporate the establishment clause of the first amendment against the states, a fact which Black ignored. This was understood by nearly all involved with the Thirty-ninth Congress to be the effect of the fourteenth amendment.

### G. *Proper Interpretative Perspective*

▉ The interpretation of the Constitution can be approached from two vantages. First, the Court can attempt to ascertain the intent of the adoptors, and after ascertaining that attempt apply the Constitution as the adoptors intended it to be applied. Second, the Court can treat the Constitution as a living document, chameleon-like in its complexion, which changes to suit the needs of the times and the whims of the interpreters. In the opinion of this Court, the only proper approach is to interpret the Constitution as its drafters and adoptors intended. The Constitution is, after all, the supreme law of the land. It contains provisions for amending it; if the country as a whole decided that the present text of the Constitution no longer satisfied contemporary needs then the only constitutional course is to amend the Constitution by following its formal, mandated procedures. Amendment through judicial fiat is both unconstitutional and illegal. Amendment through judicial fiat breeds disrespect for the law, and it undermines the very basic notion that this country is governed by laws and not by men. *See generally* Breast, *The Misconceived Quest for the Original Understanding,* 60 B.U.L.Rev. 204 (1980) (discussing various approaches to constitutional interpretation).

Let us have faith in the rightness of our charter and the patience to persevere in adhering to its principles. If we do so then all will have input into change and not just a few.

### H. *Stare Decisis*

▉ What is a court to do when faced with a direct challenge to settled precedent?[37] In most types of cases "it is more important that the applicable rule of law be settled than that it be settled right." *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting). This general rule holds even where the court is persuaded that it has made a serious error of interpretation in cases involving a statute.[38] How-

**37.** Abraham Lincoln once said, " 'Stand with anybody that stands *right.* Stand with him while he is right and *part* with him when he does wrong.' " Jaffa, *In Defense of Political Philosophy,* 34 National Review 36 (1982) (emphasis in original).

**38.** While stare decisis has more force in cases which determine the meaning of statutes as opposed to interpreting the Constitution, the Supreme Court has frequently reversed itself where it thinks an earlier decision involving the construction of a statute is in error. In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court identified four factors which it considers when faced with the question whether to overrule a prior decision which involves a statute. The factors are: 1) whether the decisions in question misconstrued the meaning of the statute as revealed in its legislative history; 2) whether overruling the decisions would be inconsistent with more recent expressions of congressional intent; 3) whether the decisions in question constituted a departure from prior decisions; and 4) whether overruling these decisions would frustrate legislative reliance on

ever, in cases involving the federal constitution, where correction through legislative action is practically impossible, a court should be willing to examine earlier precedent and to overrule it if the court is persuaded that the earlier precedent was wrongly decided. *Id.* at 407, 52 S.Ct. at 447. "A judge looking at a constitutional decision may have compulsions to reverse past history and accept what was once written. But he remembers above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put on it." Douglas, *Stare Decisis,* 49 Colum.L.Rev. 735, 736 (1949).

Certainty in the law is important. Yet, a rigid adherence to stare decisis "would leave the resolution of every issue in constitutional law permanently at the mercy of the first Court to face the issue, without regard to the possibility that the relevant case was poorly prepared or that the judgment of the Court was simply ill-considered. The danger is particularly great where the court has moved too far in an activist direction; in such a situation, legislative correction of the error is liable to be virtually impossible." Maltz, *Commentary: Some Thoughts on the Death of Stare Decisis in Constitutional Law,* 1980 Wis.L.Rev. 476, 492 (1980).

[T]he "wall of separation between Church and State" that Mr. Jefferson built at the University [of Virginia] which he founded did not exclude religious education from the school. The difference between the generality of his statements on the separation of Church and State and the specificity of his conclusions on education are considerable. A rule of law should not be drawn from a figure of speech.

*McCollum v. Board of Education,* 333 U.S. 203, 247, 68 S.Ct. 461, 482, 92 L.Ed. 649 (1948) (per Reed, J., dissenting).

"[T]he ultimate touchstone of constitutionality is the Constitution itself and not what we have said about it." *Graves v. O'Keefe,* 306 U.S. 466, 491–92, 59 S.Ct. 595, 603–04, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring). "By placing a premium on 'recent cases' rather than the language of the Constitution, the Court makes it dangerously simple for future Courts using the technique of interpretation to operate as a 'continuing Constitutional Convention.'" *Coleman v. Alabama,* 399 U.S. 1, 22–23, 90 S.Ct. 1999, 2010–11, 26 L.Ed.2d 387 (1970) (Burger, C.J.). "Too much discussion of constitutional law is centered on the Court's decisions, with not enough regard for the text and history of the Constitution itself." R. Berger, *Government by Judiciary: The Transformation of the Fourteenth Amendment* 296 (1977).[39]

their holdings. *Id.* at 695–701, 98 S.Ct. at 2038–2041.

**39.** Mr. Justice Stevens recently addressed the problem whether a court should follow authority which it believes to have been incorrectly decided. In a case which involved the construction of a statute, parents of Negro school children sued under the Civil Rights Act of 1866 (now 42 U.S.C. § 1982) for alleged discriminatory admission to private schools, which discrimination was based solely upon race. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). The statute upon which the suit was based, 42 U.S.C. § 1981, was passed prior to the adoption of the fourteenth amendment. It provides in part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts ... as enjoyed by white citizens ...." In *Runyon* two children were denied admission to private schools in Virginia solely because they were Negro. The Supreme Court held that

section 1981 prohibits private, commercially-operated, nonsectarian schools from denying admission to prospective students solely because of race. Mr. Justice Stevens concurred in the opinion of the Court, but his thoughts on stare decisis are noteworthy.

Mr. Justice Stevens felt compelled to join the opinion of the Court based upon a prior decision of the Court, *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). However, the language of the Civil Rights Act of 1866 and its historical setting left "no doubt in [Mr. Justice Stevens'] mind that the construction of [42 U.S.C. § 1982] would have amazed the legislators who voted for it." *Runyon v. McCrary,* 427 U.S. at 189, 96 S.Ct. at 2603. Given a clean slate Mr. Justice Stevens would have allowed private, commercially-operated, nonsectarian schools the right to deny admission to prospective students solely because of race. He would have reached this result not because he thought that it was socially preferable to the result reached by the

This Court's review of the relevant legislative history surrounding the adoption of both the first amendment and of the fourteenth amendment, together with the plain language of those amendments, leaves no doubt that those amendments were not intended to forbid religious prayers in the schools which the states and their political subdivisions mandate.

### I. Summary

"Th[e] mountain of evidence has become so high, one may have lost sight of the few stones and pebbles that made up the theory that the Fourteenth Amendment incorporated Amendments I to VIII." Fairman, *supra* note 25, at 134. Suffice it to say that the few stones and pebbles provide precious little historical support for the view that the states were prohibited by the establishment clause of the first amendment from establishing a religion.[40]

More than any other provision of the Constitution, the interpretation by the United States Supreme Court of the establishment clause has been steeped in history. This Court's independent review of the relevant historical documents and its reading of the scholarly analysis convinces it that the United States Supreme Court has erred in its reading of history. Perhaps this opinion will be no more than a voice crying in the wilderness and this attempt to right that which this Court is persuaded is a misreading of history will come to nothing more than blowing in the hurricane, but be that as it may, this Court is persuaded as was Hamilton that "[e]very breach of the fundamental laws, though dictated by necessity impairs the sacred reverence which ought to be maintained in the breast of the rulers towards the constitution." R. Berger, *supra* note 26, at 299 (quoting Federalist No. 25 at 158).

Because the establishment clause of the first amendment to the United States Constitution does not prohibit the state from establishing a religion, the prayers offered by the teachers in this case are not unconstitutional. Therefore, the Court holds that the complaint fails to state a claim for which relief could be granted.

### J. Conclusion

There are pebbles on the beach of history from which scholars and judges might attempt to support the conclusions that they are wont to reach. That is what Professors Flack, Crosskey and the more modern scholars have done in attempting to establish a beachhead, as did Justice Black, that there is a basis for their conclusions that Congress and the people intended to alter the direction of the country by incorporating the first eight amendments to the Constitution. However, in arriving at this conclusion, they, and each of them, have had to revise established principles of constitutional interpretation by the judiciary. Whether the judiciary, inadvertently or eagerly, walked into this trap is not for discussion. The result is that the judiciary has, in fact, amended the Constitution to the consternation of the republic. As Washington pointed out in his Farewell Address, *see* p. i *supra,* this clearly is the avenue by which our government, can and ultimately, will be destroyed. We think we move in the right direction today, but in so doing we are denying to the people their right to express themselves. It is not what we, the judiciary want, it is what the people want translated into law pursuant to the plan established in the Constitution as the framers intended. This is the bedrock and genius of our republic. The mantle of office gives us

---

Supreme Court, but simply because the intent of Congress and the legislative history surrounding the adoption of 42 U.S.C. § 1981 mandated such a result.

Where Mr. Justice Stevens was unwilling to dissent from his brethren in a case involving statutory construction, this Court feels a stronger tug from the Constitution which it has sworn to support and to defend.

**40.** Professor Fairman has summarized concisely in several pages all of the stones and pebbles which could conceivably be relied upon to support the conclusion that the fourteenth amendment intended to incorporate the federal Bill of Rights against the states. See Fairman, *supra* note 25, 134–35.

no power to fix the moral direction that this nation will take. When we undertake such course we trample upon the law. In such instances the people have a right to complain. The Court loses its respect and our institution is brought low. This misdirection should be cured now before it is too late. We must give no future generation an excuse to use this same tactic to further their ends which they think proper under the then political climate as for instance did Adolph Hitler when he used the court system to further his goals.

What is past is prologue. The framers of our Constitution, fresh with recent history's teachings, knew full well the propriety of their decision to leave to the peoples of the several states the determination of matters religious. The wisdom of this decision becomes increasingly apparent as the courts wind their way through the maze they have created for themselves by amending the Constitution by judicial fiat to make the first amendment applicable to the states. Consistency no longer exists. Where you cannot recite the Lord's Prayer, you may sing his praises in God Bless America. Where you cannot post the Ten Commandments on the wall for those to read if they do choose, you can require the Pledge of Allegience. Where you cannot acknowledge the authority of the Almighty in the Regent's prayer, you can acknowledge the existence of the Almighty in singing the verses of America and Battle Hymn of the Republic. It is no wonder that the people perceive that justice is myoptic, obtuse, and janus-like.

If the appellate courts disagree with this Court in its examination of history and conclusion of constitutional interpretation thereof, then this Court will look again at the record in this case and reach conclusions which it is not now forced to reach.[41]

**41.** One of the first of these considerations is whether the teachers and those students who desire to express the simple prayers have any rights to freedom of speech. Compare what the Court observed in the order which granted the preliminary injunction in the companion case, 82–0792–H, against the state on the first amendment right of students to pray at school. 544 F.Supp. 727 at 732–33. The evidence in the case demonstrates that the school board took no active part in any decision made by the teachers to utilize the simple prayer that they have. The school board nor any of the official body of the school administration encouraged or discouraged these teachers from exercising their own will in the matter. Nor does the evidence indicate that those students who opted for this type of exercise were coerced into participating or not participating.

In dealing with matters religious the exercise of first amendment rights are highly circumscribed. The same does not appear to be true in dealing with first amendment rights in expressing one's opinions in all other matters whether they be expressions of moral concern or immoral concern.

The second major area that this Court must concern itself with should this judgment be reversed is that raised by the evidence produced by the intervenors dealing with other religious teachings now conducted in the public schools to which no attention has apparently been directed and to which objection has been lodged by the intervenors.

There are many religious efforts abounding in this country. Those who came to these shores to establish this present nation were principally governed by the Christian ethic. Other religions followed as the population grew and the ethnic backgrounds were diffused. By and large, however, the Christian ethic is the predominant ethic in this nation today unless it has been supplanted by secular humanism. Delos McKown, witness for the plaintiff, expressed himself as believing that secular humanism has been more predominant through the years than we have imagined and indeed was more akin to the beliefs of George Washington, Thomas Jefferson, Benjamin Franklin, and others of that era. Delos McKown also testified that secular humanism is not a religion, though he ultimately waffled on this point. The reason that this can be important to the decision of this Court is that case law deals generally with removing the teachings of the Christian ethic from the scholastic effort but totally ignores the teaching of the secular humanist ethic. It was pointed out in the testimony that the curriculum in the public schools of Mobile County is rife with efforts at teaching or encouraging secular humanism—all without opposition from any other ethic—to such an extent that it becomes a brainwashing effort. If this Court is compelled to purge "God is great, God is good, we thank Him for our daily food" from the classroom, then this Court must also purge from the classroom those things that serve to teach that salvation is through one's self rather than through a diety. Indeed, the Supreme Court in *Abington School District v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963) (quoting *Zorach v. Clauson*, 343 U.S. 306, 314, 72 S.Ct. 679, 684,

# 1130

## III. Order

It is therefore ordered that the complaint in this case be dismissed with prejudice. Costs are taxed against the plaintiffs. Fed. R.Civ.P. 54(d).

96 L.Ed. 954) (1952), noted that "the State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to a religion, thus preferring those who believe in no religion over those who do believe."

That secular humanism is a religion within the definition of that term which the "high wall" must exclude is supported by the finding in *Torcaso v. Watkins*, 367 U.S. 488, 495 n. 11, 81 S.Ct. 1680, 1684 n. 11, 6 L.Ed.2d 982 (1961), which recognized that secular humanism is a religion in the traditional sense of the word and also in the statement of the 276 intellectuals who advocate the doctrine of secular religion as delineated in the *Humanist Manifesto I and II.* (Defendant-intervenors exhibit # 10).

Textbooks which were admitted into evidence demonstrated many examples in the way this theory of religion is advanced. The intervenors maintain that their children are being so taught and that this Court must preclude the Mobile County School Board from continuing to advance such a religion or in the alternative to allow instruction in the schools that would give a child an opportunity to compare the ethics of each religion so as to make their own credibility or value choices. To this extent, this Court is impressed that the advocacy of the intervenors on the point of necessity makes them parties plaintiff and to this extent they should be realigned as such inasmuch as both object to the teaching of certain religions.

This Court is confronted with these two additional problems that must be resolved if the appellate courts adhere to their present course of interpreting history as did Mr. Justice Black. Should this happen then this Court will hunker down to the task required by the appellate decisions. A blind adherence to Justice Black's absolutism will result in an engulfing flood of other cases addressed to the same point raised by intervenors. The Court will be called upon to determine whether each book or any statement therein advances secular humanism in a religious sense, a never-ending task. Already the involvement of this Court with determining state activities in such things as prison cases, occupies one-third of its docket. This Court can anticipate no less of a burgeoning docket brought about by this incursion into what is legitimately a state concern.

The founding fathers were far wiser than we. They were content to allow the peoples of the various states to handle these matters as they saw fit and were patient in permitting the processes of change to develop orderly by established procedure. They were not impatient to bring about a change because we think today that it is the proper course or to set about to justify by misinterpretation the original intent of the framers of the Constitution. We must remember that "He, who reigns within Himself, and rules passions, desires, and fears, is more a king" Milton, *Paradise Regained.* If we, who today rule, do not follow the teachings of history then surely the very weight of what we are about will bring down the house upon our head, and the public having rightly lost respect in the integrity of the institution, will ultimately bring about its change or even its demise.