Bernard LITMAN, Plaintiff-Appellant,

v.

## MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee.

No. 85–5939.

United States Court of Appeals, Eleventh Circuit.

Aug. 31, 1987.

Joel D. Eaton, Podhurst Orseck Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, Fla., for plaintiff-appellant.

Gerry S. Gibson, Steel Hector & Davis, Miami, Fla., for defendant-appellee.

Before RONEY, Chief Judge, GODBOLD, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK and EDMONDSON, Circuit Judges, and HENDERSON *, Senior Circuit Judge.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING IN BANC

FAY, Circuit Judge:

The case was taken in banc to consider whether the mandate in *Litman v. Massachusetts Mutual Life Insurance Co.*, 739 F.2d 1549 (11th Cir.1984) ("*Litman I*") was properly executed. The mandate included an order for a new trial on punitive damages. The district court did not conduct a new trial, however, because it was of the opinion that the "Waiver of a Right to New Trial and Consent to Entry of Judgment" presented by Massachusetts Mutual ("Mass Mutual") was an acceptable alternative disposition of the case. For the reasons that follow, we find that the district court's order was inconsistent with and in disregard of the law of the case established in *Litman I.* We REVERSE and REMAND for a new trial on punitive damages. Because this case involves the structural relationship between the appellate court and district court within the judicial hierarchy, we examine the creation of the federal court system, the tools that emerged to enforce the three-tier structure and the institutional values the tools are designed to perpetuate.

---

* Henderson, Senior Circuit Judge, has elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

I. Historical Perspective of the Organization of the Federal Court System.

Judicial power is created by the Constitution and Congress. Art. III of the Constitution provides: "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const., art. III, § 1. As early as 1789, Congress created district courts and circuits courts. Judiciary Act of 1789, ch. 20, 1 Stat. 73. In 1891, Congress passed the Evarts Act, Act of Mar. 3, 1891, 26 Stat. 826, which established the circuit court of appeals as a separate intermediate level court. The primary objective of the Evarts Act was to relieve the Supreme Court of the excessive burden imposed upon it arising from the rapid growth of the country, and the steady increase in litigation, by transferring a considerable part of its appellate jurisdiction to the Circuit Court of Appeals, and making the judgments of that Court final, absent compelling circumstances. *United States v. Dickinson,* 213 U.S. 92, 97, 29 S.Ct. 485, 486, 53 L.Ed. 711 (1909); *American Construction Co. v. Jacksonville, Tampa & Key West Ry.,* 148 U.S. 372, 382, 13 S.Ct. 758, 762, 37 L.Ed. 486 (1893). Today's judicial structure emerged when Congress passed the Judicial Code of 1911, Mar. 3, 1911, ch. 231, 36 Stat. 1131, which aligned the circuit courts as those handling most appeals and assigned the district court as the general trial court of original jurisdiction. In so doing, Congress established the three tier system as well as the chain of command within the judiciary hierarchy.

■ The Constitution confers jurisdictional powers on the Supreme Court. *See* U.S. Const., art. III, § 2. The Court has limited original jurisdiction and exercises appellate jurisdiction, either by direct appeal or by the discretionary writ of certiorari, over the district courts, the courts of appeals, and the highest courts of the states. 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3507

(2d ed. 1984). The Supreme Court has the power to make determinations as to the law of the land that binds all courts. By statute Congress has assigned jurisdictional powers to both district and circuit courts. The district courts are courts of original jurisdiction. 28 U.S.C. § 1331 (1982). The circuit courts have appellate jurisdiction over district courts, administrative agencies and exercise power to issue original writs in appropriate cases. 13 C. Wright, A. Miller & E. Cooper, *supra,* at § 3506. Appellate courts have the power to issue mandates which are commands that cannot be ignored. Absent a Supreme Court decision to the contrary, district courts are compelled to follow mandates of appellate courts. *In re Sanford Fork & Tool Co.,* 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895); *Sibbald v. United States,* 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838).

The three tier system evolved purposefully and deliberately and operates to define the proper allocation of authority and responsibility within the judicial system. Experience has demonstrated that the system works. Throughout history courts at all three levels have recognized that careful observation of this allocation of authority is necessary for a properly functioning judiciary. When district courts err, appellate courts do not hesitate to correct mistakes and confine the court to its authorized boundaries. When an appellate court errs, the Supreme Court does likewise.

II. Institutional Tools, Values and Illustrations.

There are several methods used to ensure order is maintained within the judicial hierarchy. Pursuant to statutory provisions, appellate courts have the authority to issue writs of mandamus. All Writs Statute, 28 U.S.C. § 1651 (1982). The historic use of the writ of mandamus issued by an appellate court has been to exert its revisory appellate power over the district court. *Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed.

1185 (1943); *Ex parte Peru*, 318 U.S. 578, 583, 63 S.Ct. 793, 796, 87 L.Ed. 1014 (1943). The writ affords an "effective means of confining the inferior court to a lawful exercise of its prescribed jurisdiction, or of compelling it to exercise its authority when it is its duty to do so." *Ex parte Peru*, 318 U.S. at 583, 63 S.Ct. at 796. The writ of mandamus, while an extreme remedy, is still used when a district court usurps power or abuses its discretion. *Kerr v. United States District Court*, 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976); *United States v. Fernandez-Toledo*, 737 F.2d 912, 919 (11th Cir.1984); *In re Extradition of Ghandtchi*, 697 F.2d 1037, 1038 (11th Cir.1983); *see United States v. Cannon*, 807 F.2d 1528, 1529 (11th Cir.1986). The writ is a tool used to keep the courts functioning within the constitutional and congressional design.

The Supreme Court, by accepting cases through the discretionary writ of certiorari, has kept order within the courts. The notion that the federal district courts and circuit courts of appeal must adhere to controlling Supreme Court decisions is reinforced whenever necessary. In *Hutto v. Davis*, 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982), the Court emphasized the need to adhere to the hierarcal structure of the federal court system created by the Constitution and Congress. "[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to

be." *Davis*, 454 U.S. at 375, 102 S.Ct. at 706.

A recent case serves as a compelling illustration.[1] In *Jaffree v. Board of School Comm'rs*, 554 F.Supp. 1104 (S.D.Ala.1983), the district court held that the fourteenth amendment did not incorporate the establishment clause of the first amendment against the States. The district court ruled that the United States Supreme Court had erred. *Id.* at 1128. Justice Powell, in his capacity of Circuit Justice for the Eleventh Circuit, entered an interlocutory emergency stay of the judgment of the district court and stated that, "[u]nless and until this Court reconsiders the following decisions, they appear to control this case. In my view, the District Court was obligated to follow them. Similarly, my own authority as Circuit Justice is limited by controlling decisions of the full Court." *Jaffree v. Board of School Comm'rs*, 459 U.S. 1314, 1316, 103 S.Ct. 842, 843, 74 L.Ed.2d 924 (1983).

Thereafter, the Court of Appeals for the Eleventh Circuit reversed the district court's order dismissing the complaint, 705 F.2d 1526 (11th Cir.1983), *cert. denied*, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 181 (1984). The Court emphasized the district court's obligation to adhere to Supreme Court precedent. The Supreme Court had considered the historical implications and concluded that its present interpretation of the first and fourteenth amendments is consistent with the historical evidence. *Id.* at 1532. Even though the district court

---

1. For historical illustrations arising out of the Civil Rights era, *see e.g., Gormillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (Supreme Court reversed district court's order, (which was affirmed by court of appeals), dismissing complaint brought by Black citizens of Alabama challenging a legislative act altering city boundaries and effectively depriving Blacks of their right to vote on the basis of race, contrary to the fifteenth amendment); *Meredith v. Fair*, 305 F.2d 343 (5th Cir.), *cert. denied*, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66 (1962) (district court's order denying injunctive relief to Black student seeking entrance into university reversed on the basis of a finding of unlawful racial discrimination); *Boman v. Birmingham Transit Co.*, 280 F.2d 531 (5th Cir.1960) (court

reversed district court's order dismissing case holding that segregated seating on buses deprived Black plaintiffs of their constitutional rights); *United States ex rel. Goldsby v. Harpole*, 263 F.2d 71 (5th Cir.), *cert. denied*, 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78 (1959) (denial of habeas corpus petition reversed by court finding that Blacks excluded from serving as jurors on the basis of race, amounted to a denial of equal protection contrary to the fourteenth amendment); *Baldwin v. Morgan*, 251 F.2d 780 (5th Cir.1958) (court reversed the district court and struck down segregation in the railway waiting rooms in Birmingham).

concluded that the Supreme Court erred it was required to follow the controlling decision. *Id.* at 1532; *Stell v. Savannah-Chatham County Bd. of Ed.,* 333 F.2d 55, 61 (5th Cir.), *cert. denied,* 379 U.S. 933, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964). The Supreme Court affirmed the judgment of the court of appeals. *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (this appeal dealt with the narrow question of whether a period of silence for "meditation or voluntary prayer" established religion within the meaning of the first amendment). The message sent to the district court from both the Supreme Court and the court of appeals was clear— it had an obligation to follow precedent.

Many devices have been created to ensure that authority, jurisdiction and responsibility remain properly allocated among the three levels of courts within the federal judiciary. The discussion above merely serves to illustrate the point. The courts within the system have differing responsibilities and standards and values must be formulated and communicated in order to ensure that the process functions.

Institutional tools perpetuate the value of stability and predictability—essential factors in the proper operation of the judiciary. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). Predictability is essential not only to lawyers who must advise their clients about the law, but also to the notion of judicial review in creating a stable body of law. It is generally thought that appellate courts are in a better position than trial courts to accommodate the need for stability. Reviewing courts are better able to maintain the necessary continuity of doctrine over time. Carrington, *Crowded Dockets and the Court of Appeals: The Threat to the Function of Review and the National Law,* 82 Harv.L.Rev. 542, 551–52 (1969). The uniformity achieved is not necessarily rigid; the appellate court "can change, or can react to advocacy or external reality to alter the direction of its commands." P.

Carrington, D. Meador & M. Rosenberg, *Justice on Appeal* p. 148 (1976). But the primary mission of the courts recognizes this particular feature.

"Judicial precedence serves as the foundation of our federal judicial system. Adherence to it results in stability and predictability." *Jaffree v. Wallace,* 705 F.2d 1526, 1533 (11th Cir.1983). In *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) the Supreme Court discussed the reasons for adhering to precedent:

> Among these are the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.

*Id.* at 403, 90 S.Ct. at 1789. "The confidence of people in their ability to predict the legal consequences of their actions is vitally necessary to facilitate the planning of primary activity." *Id.* The law of the case doctrine rests on the same principles.

■ The law of the case doctrine was created to ensure that authority and responsibility remain properly allocated among the courts. The doctrine is based on the premise that an appellate decision is binding in all subsequent proceedings in the same case unless the presentation of new evidence or an intervening change in the controlling law dictates a different result, or the appellate decision is clearly erroneous and, if implemented, would work a manifest injustice.[2] *Piambino v. Bailey,* 757 F.2d 1112, 1120 (11th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Westbrook v. Zant,* 743 F.2d 764, 768–69 (11th Cir.1984); *Baumer v. United States,* 685 F.2d 1318, 1320 (11th Cir.1982) (quoting *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967)). A district

---

**2.** None of these exceptions are material to the case we address today.

court when acting under an appellate court's mandate, "cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded." *In re Sanford Fork & Tool Co.,* 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895); *Sibbald v. United States,* 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838).

The law of the case doctrine, self-imposed by the courts, operates to create efficiency, finality and obedience within the judicial system. *See Wheeler v. City of Pleasant Grove,* 746 F.2d 1437, 1440 (11th Cir.1984); *United States v. Williams,* 728 F.2d 1402, 1406 (11th Cir.1984); *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 662 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975); *White v. Murtha,* 377 F.2d 428, 431 (5th Cir.1967). Judicial dispute resolution must have certain essential elements. Due process, as a constitutional value, may be the cornerstone, but finality and stability, as institutional values, may be of equal importance. While the law of the case doctrine is not an "inexorable command," [3] *White v. Murtha,* 377 F.2d at 431, adherence to it helps to ensure that the essential elements are maintained in the process. Failure to honor its commands can only result in chaos.

The mandate rule is simply an application of the law of the case doctrine to a specific set of facts. *Piambino,* 757 F.2d at 1120 (citations omitted). Each tier in the judicial hierarchy has its responsibility once a mandate is issued. A mandate may be vague or precise resulting from the disposition of those issues presented which vary widely from the rather simple to the most complex. Determining the scope of a mandate can present problems with interpretation. The case law is replete with examples of disputes arising from interpretations of mandates. The disputes focus on the rela-

tionship between the appellate courts and district courts and center on the proper allocation of authority and responsibility.

The law of our circuit concerning the obligations of a district court to follow our mandates is settled. *See Piambino,* 757 F.2d 1112 (11th Cir.1985); *Wheeler v. City of Pleasant Grove,* 746 F.2d 1437 (11th Cir.1984); *Westbrook v. Zant,* 743 F.2d 764 (11th Cir.1984); *Dorsey v. Continental Casualty Co.,* 730 F.2d 675 (11th Cir.1984); *United States v. Williams,* 728 F.2d 1402 (11th Cir.1984); *Robinson v. Parrish,* 720 F.2d 1548 (11th Cir.1983); *Baumer v. United States,* 685 F.2d 1318 (11th Cir.1982). All circuits are in accord. *See e.g., Todd Shipyards Corp. v. Auto Transportation, S.A.,* 763 F.2d 745 (5th Cir.1985); *Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943 (3d Cir.1985); *In re Beverly Hills Bancorp.,* 752 F.2d 1334 (9th Cir.1984); *Devines v. Maier,* 728 F.2d 876 (7th Cir.), *cert. denied,* 469 U.S. 836, 105 S.Ct. 130, 83 L.Ed.2d 71 (1984); *Stamper v. Baskerville,* 724 F.2d 1106 (4th Cir.1984); *City of Cleveland v. Federal Power Comm'n,* 561 F.2d 344 (D.C.Cir.1977); *Crane Co. v. American Standard, Inc.,* 490 F.2d 332 (2d Cir.1973); *In re United States Steel Corp.,* 479 F.2d 489 (6th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973); *Cherokee Nation v. Oklahoma,* 461 F.2d 674 (10th Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972); *Poletti v. Commissioner,* 351 F.2d 345 (8th Cir.1965); *United States v. Iriarte,* 166 F.2d 800 (1st Cir.), *cert. denied,* 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948).

■ When an appellate court issues a specific mandate it is not subject to interpretation; the district court has an obligation to carry out the order. A different result would encourage and invite district courts to engage in *ad hoc* analysis of the propriety of appellate court rulings. Post mandate maneuvering in the district courts would undermine the authority of appellate courts and create a great deal of uncertain-

---

**3.** The district court may address issues not disposed of on appeal. *Piambino,* 757 F.2d at 1119; *see Dorsey v. Continental Casualty Co.,* 730 F.2d 675, 678–79 (11th Cir.1984).

ty in the judicial process. It would also eliminate any hope of finality.

We recognize that there are cases wherein a seemingly specific mandate such as an order for a new trial may wind up with a different result on remand. However, in such cases the opinion, when viewed in its totality, supports the alternative disposition. *See e.g., Publishers Resource, Inc. v. Walker-Davis Publications, Inc.,* 762 F.2d 557 (7th Cir.1985) (remand for a new trial did not necessarily mean that a trial would be necessary when the district court was instructed to look at the contractual provisions governing termination and then make a "determination of damages"); *United States v. Curtis,* 683 F.2d 769 (3d Cir.), *cert. denied,* 459 U.S. 1018, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982) (reversal of conviction and remand for a new trial did not preclude district court from dismissing indictment based on double jeopardy claim as constitutional question was not raised on appeal;)[4] *Shelkofsky v. Broughton,* 388 F.2d 977 (5th Cir.1968)[5] (reversal for a trial by jury did not preclude district court from disposing of the case summarily if the evidence offered was insufficient to warrant submission to the jury). Such cases do not weaken the "mandate rule" but give it

flexibility. *See Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983).

### III. *Litman v. Mass Mutual.*

With the foregoing principles in mind, we focus on the dispute before us which raises the issue of whether the opinion in *Litman v. Massachusetts Mutual Life Insurance Co.,* 739 F.2d 1549 (11th Cir.1984) ("*Litman I*"), when viewed in its totality, allows for the district court's order on remand.

### A. Procedural History[6]

This was an action for breach of general agency contract and two counts of slander brought by Bernard Litman ("Litman") against Massachusetts Mutual Life Insurance Company ("Mass Mutual"). The trial resulted in a jury verdict for Litman on all three counts and judgment was entered in the amount of $2,500,234. The jury's verdict included separate compensatory damage awards for the breach of contract claim and each of the two claims of slander.[7] The punitive damage award for the slander was undifferentiated. It was as-

---

**4.** The court in *Curtis* stated:

The district court indicated in its statements on remand that, aside from any constitutional double jeopardy concern with respect to the rights of the defendant, it might have institutional concerns of its own that would justify dismissal of the indictments. *See* Transcript of June 23, 1981 at 19. With respect to those concerns—namely, the need for integrity of the trial process and the sanctioning of prosecutors—this Court in its prior decision carefully weighed those factors ... and appeared explicitly to have concluded that a new trial was the appropriate means to protect 'the dignity and integrity of the judicial process.' [*United States v. Curtis*] 644 F.2d [263] at 271 [ (3rd Cir.1981) ] n. 6. To the extent that the district court would bar a retrial on such grounds, and not on Curtis' constitutional right against double jeopardy, the law of the case doctrine dictates that this Court's determination as to the propriety of retrial must be considered binding.

*Curtis,* 683 F.2d at 772.

**5.** The Eleventh Circuit in *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit prior to October 1, 1981.

**6.** Since a complete account of the facts and circumstances surrounding the dispute are adequately detailed in *Litman I,* we need not repeat them, except as necessary in connection with the issue now before us.

**7.** The compensatory damage awards were apportioned as follows:

| | |
|---|---|
| — breach of Contract | $2,000,234 |
| — Slanderous Statement made by Mass Mutual spokesman to a prospective employer | $ 100,000 |
| — Slanderous Statements made by two Mass Mutual employees to Litman's former insurance salesman | $ 150,000 |

sessed in response to a single question on the special verdict form.[8]

Mass Mutual appealed on several grounds and challenged the punitive damage award asserting alternative theories. Mass Mutual argued that it was entitled to judgment on the issue of punitive damages and in the alternative, that the amount of punitive damages awarded was excessive entitling it to a new trial. Our court affirmed the judgment of the district court with one exception. Finding that the statement made by a Mass Mutual spokesman to a prospective employer of Litman, could not be slander as a matter of law, the court reversed the $100,000 slander award which necessarily resulted in a reversal of the entire punitive damage award. The case was remanded to the district court for a new trial solely on the issue of punitive damages. Mass Mutual made no motions to modify the ruling or to withdraw its challenge to the award of punitive damages.

On remand, Mass Mutual filed a written "Waiver of Right to New Trial and Consent to Entry of Judgment." Mass Mutual stated that it was now content to accept the original jury verdict on the punitive damage issue in the interest of terminating the suit. The district court accepted Mass Mutual's argument that if a *prima facie* case for the award of punitive damages against Mass Mutual were shown at all, under our opinion[9] a jury would consider only a portion of the original $250,000 award for the remaining claim which was based on the statements made by two Mass Mutual employees to Litman's former salesmen. Memorandum in Support of Mass Mutual's Waiver at 3, *Litman*, (No. 78-3314 Civ-EBD). Accepting this argument the district court concluded that a new trial on

punitive damages would be inappropriate, and was not required by the mandate. The district court acknowledged that the *Litman I* opinion did not hold that the punitive damage award was excessive as a matter of law, but interpreted the holding to indicate that the award was improperly inflated. The district court framed the issue presented by Mass Mutual as a new one. Specifically, the issue as stated by the district court was whether "a [d]efendant, whose right to a new trial has been recognized by the Court of Appeals, [can] waive that right by offering to accept the original judgment, in the situation where the infirmity at the first trial necessarily inflated [p]laintiff's recovery [?]." *Litman v. Massachusetts Mutual Life Insurance Co.,* No. 78-3314 Civ-EBD p. 5 (S.D.Fla. August 20, 1985). The district court answered the question in the affirmative. Final judgment was entered in favor of Litman in the amount of $250,000, with interest from the date of entry of the original final judgment, plus taxable costs of the litigation. *Id.*

### B. Discussion

Five major premises provide the analytical framework for our disposition of this case. First, the finding that the statement made by the Mass Mutual spokesman to Litman's prospective employer was not slander as a matter of law became part of the law of the case. Second, because the special verdict form posed only a single question for punitive damages on the slander, the reversal of the slander award necessitated reversal of the original $250,000 judgment for punitive damages.[10] The effect of the reversal voided the original

---

**8.** The question on the special verdict form read: "What amount of punitive damages do you assess against the defendant, Massachusetts Mutual Life Insurance Company for *the* slander?" *Litman I,* 739 F.2d at 1562.

**9.** There is a fundamental flaw in Mass Mutual's argument. It starts with an incorrect premise. In *Litman I,* the court affirmed the jury determination of a *prima facie* case for the award of punitive damages against Mass Mutual for the

statements of its two employees. 739 F.2d at 1562. That became the law of the case.

**10.** *See Neely v. Bankers Trust Co.,* 757 F.2d 621, 630 (5th Cir.1985); *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1547–48 (5th Cir.1984); *Barnes Group, Inc. v. C & C Products, Inc.,* 716 F.2d 1023, 1034 (4th Cir.1983).

judgment.[11] Third, the basis for an award of punitive damages on the surviving slanderous statements was affirmed on appeal and became part of the law of the case. Litman was entitled to punitive damages. Fourth, the litigants were sent back to the district court for a new determination of punitive damages as if the first trial never occurred.[12] Fifth, a jury trial on punitive damages is the only proper outcome under Florida law unless a settlement was negotiated between the parties or the mandate modified by the court of appeals.

 Given the law of the case established in *Litman I,* the mandate was clear and specific—the district court was to conduct a new trial solely on the issue of punitive damages. Mass Mutual argues that under Florida law and the facts of this case, a right to a new trial on punitive damages belonged to it alone. We disagree. Our opinion in *Litman I* governs the rights and obligations of both parties. Once the appellate ruling became final, the right to a new trial belonged to neither party individually but rather to both. The law of the case prescribed the outcome and could not be altered. Although Litman had no right under Florida law to seek a new trial on punitive damages, the first appeal left Litman in a position where the original judgment was set aside yet the basis for the punitive damage award was affirmed. The law of the case established that Litman

was entitled to punitive damages. Both parties had a right for a jury to set the amount. But the original judgment as to the amount of punitive damages was null and void. It no longer existed.

The Florida Supreme Court defines the respective provinces of the court and jury explicitly when claims for punitive damages are presented. The court decides whether there is a legal basis for recovery of punitive damages, the jury sets the amount, if any. A trial judge may not substitute its judgment for that of the jury. *Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 767 F.2d 1498, 1503 (11th Cir.1985); *St. Regis Paper Co. v. Watson,* 428 So.2d 243, 247 (Fla.1983); *Arab Termite & Pest Control v. Jenkins,* 409 So.2d 1039, 1041 (Fla.1982). Once the error was established on the slander claim, the case necessarily went back for a jury determination of the amount of punitive damages on the surviving claim.[13]

The district court erred when it stated that since the first reasonable jury that heard the evidence awarded an amount of $250,000 based on three slanderous statements, it follows, inexorably, that another reasonable jury, when presented with the assessment of the amount of punitive damages for only two slanderous statements, would fix an amount at less or equal to the $250,000 award.[14] *Litman v. Massachusetts Mutual Life Insurance Co.,* No. 78–

---

**11.** Reversal is defined as the annuling or setting aside by an appellate court of a decision of a lower court. H. Black, *Black's Law Dictionary,* p. 1185 (5th ed. 1979).

**12.** See *Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943, 950 (3d Cir.1985); *Poletti v. Commissioner,* 351 F.2d 345, 347 (8th Cir.1965); *United States v. Iriarte,* 166 F.2d 800, 803 (1st Cir.), *cert. denied,* 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948); *Roth v. Hyer,* 142 F.2d 227, 229 (5th Cir.), *cert. denied,* 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573 (1944).

**13.** This analysis forecloses Mass Mutual's argument regarding Litman's attempt to challenge the punitive damage award on grounds of inadequacy which is prohibited by Florida law. *St. Regis Paper,* 428 So.2d at 247. The second appeal was a result of a district court order reinstating a jury verdict that did not exist. After

the *Litman I* court affirmed the legal basis of the punitive damage award on the surviving claim, a new trial became necessary so a jury could determine the appropriate assessment of damage for the purpose of punishment and deterence. *Id., Arab Termite,* 409 So.2d at 1041.

**14.** Mass Mutual argued and the district court agreed that the quote from *Arab Termite,* 409 So.2d at 1041, in the *Litman I* opinion stating that an order for a trial on punitive damages was justified when the amount assessed was "out of all reasonable proportion to the defendant's malice," implied that the mandate be interpreted so that the punitive damage award be either less than or equal to the original judgment of $250,000. This interpretation is incorrect. The first panel never attempted to assess the amount of punitive damages. It merely cited the Florida law as support for the legal

3314 CIV–EBD p. 4 (S.D.Fla. August 20, 1985). There simply is no basis in law to support such a conclusion. Speculating what a reasonable jury would decide is not within the province of the judicial office. The notion undermines the integrity of the jury system. In addition, it improperly imposes on the clear policy underlying Florida law on punitive damages. "Punitive damages 'are peculiarly left to the discretion of the jury as the degree of punishment to be inflicted must always be dependent on the circumstances of each case, as well as upon the demonstrated degree of malice, wantonness, oppression, or outrage *found by the jury* from the evidence.'" (emphasis supplied). *Arab Termite*, 409 So.2d at 1041 (quoting *Wackenhut Corp. v. Canty*, 359 So.2d 430, 436 (Fla.1978)). Courts are not free to postulate about what a reasonable jury might decide. The mandate ordered a new trial based on certain slanderous statements, the basis for recovery of punitive damages having been affirmed. *Litman I*, 739 F.2d at 1562. The jury, as dictated by the law of Florida must take *that* circumstance and determine the amount of punitive damages that would best serve the public policy of punishment and deterrence. *St. Regis Paper*, 428 So.2d at 247; *Arab Termite*, 409 So.2d at 1041. Judges' feelings that other results are more reasonable do not displace the jury function. *Tennant v. Peoria & Pekin Union Ry*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). A new jury may award more or less. Judicial review encompasses a determination of whether an inference or conclusion drawn by jury is reasonable. Reasonableness by definition encompasses a wide range of possibilities. It is not for any judge to substitute his judgment in making the inferences or drawing the conclusions. Since the district

court did not conduct a new trial on the amount of punitive damages pursuant to Florida law, Litman became an "aggrieved party," *Piambino*, 757 F.2d at 1120, and is entitled to redress.

It is uncontroverted that money is the center of this dispute. This is the reality of many lawsuits. Litman concedes a desire to maximize his recovery by insisting that Mass Mutual submit to a new trial which it obtained at his expense. Mass Mutual, on the other hand, suggests that its sole interest is terminating the litigation. Although understandable such a decision is not possible after one has taken full advantage of its appellate rights and "lost". It is rather the type of decision required prior to an appeal. Perhaps justifiably fearful of the consequences, Mass Mutual "waived" its right to a new trial and consented to reinstate the original verdict and judgment. Mass Mutual has no right to waive the trial ordered by the law of the case nor can the district court reinstate a verdict which has been vacated by this court. *See Slokin v. Citizens Casualty Co.*, 698 F.2d 154, 157 (2d Cir.1983). District courts lack the authority to resurrect that which the court of appeals has voided.

■ That the result may be fair is not the issue we address. Mass Mutual's "waiver" effectively modified the mandate by unilateral action. We hold today that a successful appellant cannot change its mind and take unilateral action in a trial court to modify a mandate of this court. Such post-decision maneuvering undermines the process creating confusion, uncertainty and potential abuse.[15] When the district court accepted Mass Mutual's "waiver" of a new trial solely on the issue

---

basis for an order for a new trial on punitive damages.

**15.** Appeals would almost certainly multiply geometrically. Two examples illustrate the point. First, a defendant in a personal injury action may successfully appeal an adverse verdict only to learn that the plaintiff has since died. In an attempt to minimize his exposure he decides to

"waive" the order for a retrial on damages. *Litman II*, 791 F.2d 855, 861 (11th Cir.1986) (Fay, J., dissenting). Second, a plaintiff appeals a damage award and the appellate court decides it is a compromised verdict. The court mandates a new trial on liability and damages. Plaintiff then decides to "waive" the new trial on liability.

of punitive damages, it disregarded the instructions of this court. "Even at the joint request of the litigants, the district court may not deviate from the mandate of an appellate court." *Atsa of California, Inc. v. Continental Insurance Co.*, 754 F.2d 1394, 1396 (9th Cir.1985). When the district court agreed with Mass Mutual that a reasonable jury would necessarily conclude that the award would be equal to or less than the original judgement it decided contrary to the law of the case established on the prior appeal and exceeded its institutional authority. *See Farr v. H.K. Porter Co.*, 787 F.2d 1014, 1016 (5th Cir.1986); *Trahan v. First National Bank*, 720 F.2d 832, 833 (5th Cir.1983). We feel confident the district court thought it was doing justice in this case by issuing the order reinstating the jury verdict.

> Trial judges are more directly and immediately confronted by the demands of doing justice, case by case, than are we; indeed, this is their primary office and duty. Yet it is the considered judgment of our policy that in the long run—if not perhaps in the given case—justice is better served by adherence to general rules.

*Trahan*, 720 F.2d at 834.

The consequences of *ad hoc* examinations of the propriety of unambiguous mandates are too grave to be allowed.

Mass Mutual's failure to seek modification of our decision had the effect of binding the district court to our instructions as set forth in the clear mandate. Mass Mutual couched the "waiver" as a new issue raised for the first time in the district court on remand. We disagree. We consider the "waiver" to be an attempt by Mass Mutual to circumvent the mandate rule in order to minimize the exposure created when its request on appeal was granted. Mass Mutual had an opportunity to bring the matter before this court. A motion to modify our ruling or withdraw the challenge asserted would have received full consideration.

Mass Mutual advocates the position that the mandate rule is not an "inexorable command" to be followed mindlessly by the district courts without regard to consequences. We agree that the mandate rule is not an "inexorable command." The consequences which may materialize due to circumstances arising after remand, however, are governed by the law of the case doctrine. If circumstances after remand fall into one of the three exceptions to the mandate rule, the district court has greater discretion to act. If the circumstances after remand do not fall into one of the exceptions, as conceded in this case, then the district court is constrained to follow the mandate issued by the appellate court. Since our case falls into the latter category, the district court erred by not conducting a trial on punitive damages.

There are downside risks to appeals. Litigants must use their best judgment when mapping out strategy. If a new trial is requested and the mandate instructs the district court to conduct a trial solely on the issue of punitive damages, the potential risk of a larger award is apparent. Mass Mutual should have assessed and evaluated that risk before it challenged that award in this court.

## IV. CONCLUSION.

The mandate is a tool used to ensure that institutional values are maintained and that the allocation of authority and responsibility remains consistent with the design established under the law of our form of government. When an appellate court issues a clear and precise mandate, namely an order for a new trial on punitive damages, the district court is obligated to follow the instruction. Neither the district court nor any party is free to ignore the law of the case, including the determination that there was a basis for an award of punitive damages necessitating a jury assessment of the proper amount. It was inappropriate to "interpret" the *Litman I* opinion in a way that effectively circumvented the mandate. Accordingly, we REVERSE and REMAND the case to the district court with instructions to conduct a trial on the issue of punitive damages as originally ordered.

EDMONDSON, Circuit Judge concurs in the judgment.

HILL, Circuit Judge, concurring dubitante:

I concur in the judgment. While I take no specific issue with the reasons for the judgment given in the opinion, I fear that we may not yet have addressed, directly, important considerations.

Much of Judge Fay's splendid opinion points out that those who have lost in the court of appeals may not properly seek to reverse that result in the district court when the mandate appears there. It would seem that this goes without saying, but I certainly take no issue with the majority for saying it again. That, however, is not the problem before us in this case. We do not have a loser in this court seeking to have the district court reverse this court's judgment. What we have here is one who has won in this court undertaking to forego the fruits of its victory. The question is whether or not a litigant *who is the beneficiary of this court's judgment* may elect to forego implementation of its victory in the district court and, if so, how and under what circumstances it should be allowed to do so. Of course, not all mandates of the appellate court are required to be carried out by the district court. If we reverse and remand a case to the district court for a new trial, it is no offense to the dignity and authority of this court that the parties settle the case so that the ordered new trial does not take place. *Absoluta sententia expositore non indiget.*

I apprehend that the problem addressed in this case is the result of shortsightedness on the part of parties and their counsel, asking for relief on appeal even though careful analysis would demonstrate that the relief would be more harmful than helpful. Further, I apprehend that this problem can develop when somewhat overenthusiastic appellate judges find in an appeal relief the judge feels appropriate for a party who has not requested it, but orders it granted, anyway.[1] In each of these scenarios, the party apparently prevailing usually finds it is more damaged by the relief when relief is granted on less than all of the issues presented in the appeal.

That is obviously the case here. Had Massachusetts Mutual obtained all of the relief it sought in the appeal, it would be quite content that the mandate be strictly enforced. While it sought the elimination of all damages awarded against it, it obtained the elimination of the only award which Mr. Litman may have been disappointed with, and a new trial has been ordered as to only that one. Thus, having received only partial relief, Massachusetts Mutual is potentially in a worse position than it would have been in had it chosen not to appeal at all.

I believe that our procedures ought to afford a litigant with some relief under these circumstances. Our opinion and judgment should tell the successful party that it has been granted the right to the relief, and that party ought to have some procedure available through which it can waive that right. The nearest thing we have seems to be the right to petition this court for rehearing and, as Judge Fay points out, Massachusetts Mutual did not ask us to vacate any of the relief it had apparently won.

There must be a time limit on the period in which a litigant can seek to waive its relief, and the lack of such a limit is my major concern here. Inasmuch as I am convinced that a litigant such as Massachusetts Mutual ought not have an opportunity, unlimited by time and procedure, to avail itself of the benefits of the judgment or to forego them, the judgment in this case must be correct. Massachusetts Mutual may not pursue the litigation as long as it deems it expedient to do so and then forego the benefits of our mandate when its interest seem thereby served. This would allow a litigant such as Massachusetts Mutual to put its adversary and the

---

1. This is not what happened in this case. The record makes it clear that Massachusetts Mutual argued for and sought the vacation of the punitive damages, the reassessment of which now looms threateningly on the horizon.

**1518**

district court through preparation for and commencement of the retrial we have ordered, only to tell the district court and its opponent to undo all that had been done if the jurors selected did not suit.

In short, litigants ought not seek relief they really do not want and judges ought not grant relief not sought. Should parties prevail in a limited way to their displeasure, they ought to move promptly for relief. Ultimately, rules should be established for the waiver of benefits obtained by our judgment, requiring that it be done promptly and for good reason. I concur in the judgment.

TJOFLAT, Circuit Judge, dissenting in which JOHNSON and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge, join:

## I.

In *Litman v. Massachusetts Mut. Life Ins. Co.*, 739 F.2d 1549 (11th Cir.1984) (hereinafter *Litman I*), a panel of this court held that the district court erred in submitting to the jury a claim of slander that the law does not recognize. The panel therefore set aside the jury's award of compensatory damages on that claim. The panel also concluded that the district court's error in submitting this claim to the jury might have influenced the jury's assessment of the punitive damages the plaintiff, Bernard Litman, was entitled to receive on another claim of slander. Because the panel could not say that the error was harmless, it assumed that the error enhanced the punitive damages award and therefore set that award aside as well. The panel provided the only relief that could right the wrong Massachusetts Mutual Life Insurance Company (Mass. Mutual) had suffered; it ordered "the issue [of punitive damages] remanded for a new trial." *Litman I*, 739 F.2d at 1562.

Following the panel's decision in *Litman I*, Mass. Mutual decided to pay the punitive damages award and waive its right to a new trial. Mass. Mutual promptly notified the district court of its decision and requested the entry of a final judgment for Litman in the full amount of the award. Litman opposed Mass. Mutual's request, arguing that the *Litman I* decision *entitled* him to a new trial on the issue of punitive damages.

The district court considered the mandate of the *Litman I* panel and determined that it could, consistent with the mandate, grant Mass. Mutual's request. The court concluded that the *Litman I* panel had not foreclosed the possibility that "a Defendant, whose right to a new trial has been recognized by the Court of Appeals, [could] waive that right by offering to accept the original judgment, in the situation where the infirmity at the first trial necessarily inflated Plaintiff's recovery." Because the district court believed that Mass. Mutual's proposal would do Litman no injustice, indeed that it would give him the benefit of an improperly enhanced verdict, it required Litman to accept the payment.

## II.

The majority chooses to present the district court's action as a threat to the institutional power of appellate courts, the stability and predictability of the law, the law of the case doctrine, and the mandate rule. *See ante* at 1508–1512. I submit that the majority has, regrettably, failed to see the forest for the trees.

In *Piambino v. Bailey*, 757 F.2d 1112, 1119 (11th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986) (citations omitted), we set forth the law of this circuit regarding the mandate rule, stating the following:

A trial court, upon receiving the mandate of an appellate court, may not alter,

amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate. The trial court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion, and the circumstances it embraces. Although the trial court is free to address, as a matter of first impression, those issues not disposed of on appeal, it is bound to follow the appellate court's holdings, both expressed and implied.

The *Litman I* panel explicitly ordered a new trial on the issue of punitive damages. In granting Mass. Mutual a new trial, however, the panel did not address, and thus its mandate did not answer, the question whether Mass. Mutual could still pay the punitive damages award, notwithstanding its presumptive excessiveness, and end the controversy. Accordingly, under *Piambino*, the district court was "free to address" this issue and to permit Mass. Mutual to pay the award, in lieu of a new trial, if this would not do violence to *Litman I*'s rationale. To decide whether *Litman I*'s rationale barred the course the district court pursued, we need not, contrary to the majority's suggestion, reinterpret the mandate rule.

We are now in the same position as the *Litman I* panel would have been had Mass. Mutual requested that panel to clarify its mandate to permit Mass. Mutual to pay the punitive damages award in lieu of a new trial.[1] Indeed, the only difference between the present posture of the case and that hypothetical situation is that Mass. Mutual sought the relief from the district court, rather than from the panel. Although this is obviously not a procedure that we should

encourage, logic and common sense favor our approval of the district court's decision.

The *Litman I* panel plainly had the power to amend its mandate to offer Mass. Mutual the choice of paying the punitive damages award or availing itself of a retrial. *Cf. Wilson v. Taylor*, 733 F.2d 1539, 1549–50 (11th Cir.1984) (ordering plaintiff to accept a remittur or granting defendant a new trial on the question of damages). The majority concedes as much. *See ante* at 1516. Furthermore, such an amendment would not have been inconsistent with, or precluded by, the panel's rationale and holding. The question we must decide is whether the district court was somehow precluded from doing what the panel could, and no doubt would, have done. Common sense dictates that the district court was authorized to grant Mass. Mutual the same relief that the panel could have awarded. Fashioning the same relief cannot be considered as an affront to the appellate authority of this court or to the mandate rule. Moreover, Litman cannot complain. The panel did not grant *him* the right to a new trial; the "right" he claims, and the majority accords him, was merely the consequence of the explicit relief the panel gave Mass. Mutual.

Finally, I must respond to the majority's fear that permitting Mass. Mutual to waive its right to a retrial will create a "potential [for] abuse" of the appellate system. *Ante* at 1515. The majority apparently fears that allowing an appellant who has successfully challenged a damages award as excessive [2] to pay the award in lieu of a new trial will produce a flurry of "risk free" and ill-considered appeals. An examination of the three instances in which a party might consider appealing an award of damages as excessive, whether compensatory or puni-

---

**1.** This would be tantamount to a request that the panel vacate its opinion and dismiss the appeal.

**2.** The ground that the award is excessive would include claims that the evidence did not support

damages in the amount awarded and claims that the damages were improperly enhanced because of trial court error, the type of claim Mass. Mutual prevailed on in *Litman I.*

tive, demonstrates that such fear is unwarranted. First, if the damages award is below the reasonable range dictated by the facts of the case, the defendant will have no incentive to appeal because he will most likely lose. His only possible incentive to appeal would be to induce the plaintiff to accept less than full payment of his award to save appellate attorney's fees and costs. On reflection, however, the defendant will realize that this is really no incentive at all because he will incur the same, if not more, fees and costs than the plaintiff, and he will incur them earlier.[3]

Second, if the damages award is within the reasonable range dictated by the facts of the case, the defendant may have a slight incentive to appeal. The measure of the defendant's incentive to appeal will depend on where within the reasonable range the award fell, i.e., the higher the award is within the range, the greater the incentive to appeal. Again, in deciding whether to appeal, the defendant will realize that saving attorney's fees and costs will probably not induce the plaintiff to settle for less because the plaintiff will know that the defendant's fees and costs will be greater, and he will call the defendant's bluff. In other words, the plaintiff will refuse a post-verdict compromise settlement because he will know that the defendant will have to pay practically dollar for dollar for any discount of the award he might obtain, i.e., the defendant will incur fees and costs in $X$ amount to get the plaintiff to accept $X$ amount (the sum of the plaintiff's fees and costs) less. It is only in the case where the damages award is very close to the top of the reasonable range that the plaintiff may

be willing to accept something less than full satisfaction of his judgment. Finally, if the damages award is higher than the reasonable range dictated by the facts of the case, the defendant will have an incentive to appeal; few defendants readily acquiesce in an exaggerated verdict.

I fail to see how granting a victorious appellant—who has persuaded the appellate court that his adversary's damages award is excessive and has been accorded a new trial—the option of paying the excessive award and terminating the case will encourage even one more appeal. The granting of such an option could not possibly damage the federal judicial system or impair the orderly administration of justice. On the contrary, by ridding the courts of the burden of retrials that successful appellants wish to avoid, the option will benefit the system.[4]

I respectfully dissent.

---

3. The defendant would have to pay the filing fee and pay for the preparation of the trial transcript, expenses not borne by the plaintiff, and would incur his attorney's fees first, his brief being due first.

4. The majority also argues that "[e]ven at the joint request of the litigants, the district court may not deviate from the mandate of an appellate court." *Ante* at 1516 (quoting *Atsa of Calif., Inc. v. Continental Ins. Co.,* 754 F.2d 1394, 1396 (9th Cir.1985) (citation omitted)). Surely the majority cannot mean that a district court must always hold a new trial merely because the appellate court ordered one to cure the error suffered by the appellant. If, after the issuance of a new trial mandate, all parties agree to settle the case, I cannot conceive of any logic or rule of law that would forbid the district court from closing the case.